UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

United States of America,      )
                               )
        Plaintiff,             )
                               )        4:23-cr-1495-AMM-EJM
vs.                            )
                               )        Tucson, Arizona
Jeffrey Allen Koistinen,       )        April 21, 2025
                               )        1:36 p.m.
        Defendant.             )
_____)


**TRANSCRIPT OF PROCEEDINGS**
**MOTION HEARING**

BEFORE THE HONORABLE ERIC J. MARKOVICH
UNITED STATES MAGISTRATE JUDGE


<u>APPEARANCES</u>

For the Government:

    Carin Duryee
    Nathaniel Walters
    United States Attorneys Office
    405 West Congress Street, Suite 4800
    Tucson, Arizona 85701

For the Defendant:

    Nicholas Loncar
    Tucson Defenders, Attorneys at Law
    2030 East Broadway Boulevard, Suite 123
    Tucson, Arizona 85719


Transcribed by:
    Anni Bryan
    (520)205-4268


Proceedings digitally recorded
Transcript prepared by transcriptionist

1                    **P R O C E E D I N G S**

2                           *  *  *

3         (Hearing commences at 1:36 p.m.)

4              THE CLERK:  In criminal case number 23-01495, Jeffrey

5    Allen Koistinen, on for a motion hearing.

6         Counsel, please state your appearance.

7              MS. DURYEE:  Good afternoon, Your Honor.  Carin Duryee

8    and Nate Walters for the United States.

9              THE COURT:  Good afternoon.

10             MR. LONCAR:  Good afternoon, Your Honor.  Nicholas

11   Loncar, L-o-n-c-a-r, on behalf of Mr. Koistinen, who's present,

12   to my left, in custody.

13             THE COURT:  Good afternoon to you both.

14        So we're -- the government filed a motion for an inquiry

15   into a potential conflict of interest.

16        Mr. Loncar, you filed a response.

17        I'm not sure that we're really going to get that issue

18   resolved today, at least from my perspective, unless anything

19   has changed since the pleadings were filed.

20        I take it things are the same?

21             MR. LONCAR:  I would say things are pretty much the

22   same.

23             THE COURT:  So let me ask:  Did you guys obtain some

24   transcripts from the state court proceeding, specifically the

25   cross-examination that was done on Brandon Koistinen and/or the

1    discussion that occurred with the superior court judge when

2    Mr. Loncar did withdraw from representation?  Do we have that

3    stuff?

4              MR. LONCAR:  The latter, what the Court just

5    mentioned, in that conversation when I did withdraw, I believe

6    the government did include it in its exhibit, in its motion.

7              THE COURT:  I don't have that exhibit.

8              MR. LONCAR:  I did not include it as an exhibit, but I

9    do have -- and I have shared with the government -- the

10   transcript of the cross-examination of Brandon in the first

11   trial.

12             THE COURT:  Okay.  That would be helpful if I could --

13   somebody could submit that cross-examination as just a

14   supplemental exhibit.

15       Rose, will you see if there's an exhibit to the

16   government's motion?  I don't know why that didn't get printed.

17             THE CLERK:  Yes, there was.

18             MS. DURYEE:  There was, Your Honor.

19             THE COURT:  So, Mr. Loncar, I mean, the cases that you

20   guys cited, obviously I've read them; they're on point to an

21   extent.  A lot of them deal with someone representing two

22   defendants at different points in time, which you did,

23   Mr. Loncar, but that's not the issue.  Your client's son is a

24   witness.

25       The government mentioned *Agosto*.  The Ninth Circuit went

1    through and said the district Court erred in many respects, but

2    the one respect that the district court did not err on was a

3    conflict regarding some witnesses who counsel for the defendant

4    had previously represented.

5        You had mentioned, Mr. Loncar, that your client would waive

6    a conflict.  That I don't think is the issue.  I think your

7    client would have to still engage in a waiver, but it seems to

8    me that his son is the one, because of the confidential

9    information, who's going to have to potentially be willing to

10   waive any conflict.  I know you said in your pleading that that

11   had been done, but then you couldn't find that document.  Have

12   you had any luck with that?  I'm not even sure -- to be honest,

13   the posture of the representation was so different back then

14   than now, we'd probably still need a new waiver.

15           MR. LONCAR:  Just to summarize the timeline, there was

16   a jury trial in a case that did begin with both Mr. Koistinen,

17   my client, and his son, Brandon, as defendants.

18           THE COURT:  Just to be clear, you represented them

19   both at trial?

20           MR. LONCAR:  No.

21           THE COURT:  No.  You originally represented Brandon,

22   and then just your current client.  Then you crossed Brandon.

23           MR. LONCAR:  Yes.  They both came to my office one day

24   when there was an investigation.  There had just been a search

25   warrant executed at a rental property that my client owns and a

1    property where Brandon resided.

2        At that time, it wasn't really clear who, if anybody, was

3    going to get charged with a crime for marijuana cultivation.

4    And, yes, I did -- I do have the written conflict waiver which

5    both Jeffrey and Brandon Koistinen signed that day in my

6    office.  It was discussed that if they were both arrested and

7    charged that I would only be able to represent one of them in

8    court.  They both were arrested just hours later after leaving

9    my office, and Brandon obtained other counsel prior to court

10   representation beginning -- or he being arraigned.

11       Just before -- so a trial did take place in September.  As

12   I indicated in my response, the first offer that everyone got

13   in this marijuana cultivation case was a minimum of two years

14   in prison.  The state then offered Brooke and Brandon, the two

15   children, probation-available pleas in exchange for their

16   cooperation against Jeffrey.  That all happened well over a

17   year after the brief joint representation, and it was also even

18   more than that before I was notified of that.

19       So a jury trial against only Jeffrey where both of his

20   children testified against him took place in September.  At

21   that point, Brandon did not object to continued representation

22   of Jeffrey or of my cross-examination of him.  But in the few

23   days leading up to the retrial, Brandon indicated to the state

24   court prosecutor that he didn't think it was fair that someone

25   who previously represented him would be able to cross-examine

1    him.  And he made specific allegations of questions that he

2    believed in the first trial I would only have known based on

3    information he told me and filed a bar complaint against me.

4        I was able to conclusively prove that every one of his

5    three examples was not -- couldn't have even been possible to

6    have been just from his representation.  I had represented his

7    father, Jeffrey, for over two years at that point.  And for the

8    first nine months following Brandon's arrest, because his

9    residence had been raided, he lived with my -- with my client.

10   So not one of the three examples that he cited were anything

11   that came from my very brief and very remote-in-time at that

12   point joint representation.

13       I mean, the timing of those accusations did give me concern

14   that I don't have today because I was really in the middle of

15   trial preparation.  My file for that marijuana case was bigger

16   than a banker's box full.  And in that brief time, that's where

17   I wasn't able to locate the conflict waiver, which I later did,

18   but didn't have with me that day.  And, again, it being two

19   years prior, I didn't -- I knew that it would have been my

20   practice to have them sign a conflict waiver.  I just didn't

21   have a specific recollection of that day.  But there was, and I

22   do have it.

23           THE COURT:  That would be helpful if you could submit

24   that as well, then, in another exhibit.

25           MR. LONCAR:  Now, the conflict waiver did permit for

1    a written withdrawal, which never came directly from Brandon,

2    but I took his filings, withdrawal from the conflict waiver,

3    his attorney's filings and the state's filings as more or less

4    being what would have revoked consent there.

5        So I probably still would stand by the decision to withdraw

6    in that case because it was related.  And at least as to the

7    first trial, where Brandon hadn't been sentenced yet, he may

8    have had a state -- he may have had some kind of standing to

9    object to my continued representation of Jeffrey.

10       But in this case -- and I understand this will probably be

11   more a question for the trial judge, but I really don't believe

12   that Brandon has any relevant testimony to offer in this case

13   and that it's really just something that the state is doing

14   because they knew the conflict existed.  And I think that

15   that's how the timeline works out.  They certainly hadn't even

16   spoken to Brandon yet when they told me that they intended to

17   call him as a witness.

18       We got two motions to extend the deadlines for the response

19   to suppression motions because the state didn't have time --

20   I'm sorry -- the government didn't have time, but the

21   government had time to file this motion.

22       So I -- I'm just not at all concerned about a conflict, but

23   I am troubled by the fact that this is being raised in a case

24   where he doesn't even really have any relevant testimony.

25   Whoever does cross-examine him, should he testify, though, will

1    be able to go into provably false statements that he made the

2    last time he testified against his dad, potentially even the

3    false statements that he made against me.  And so whoever

4    cross-examines him is going to raise issues that Brandon

5    previously committed perjury.  And on account of that, I would

6    point to the part of my response asking the Court to appoint

7    counsel for Brandon so that he could be independently advised

8    whether he would want to take the risk of testifying.

9         THE COURT:  So -- well, you're right, it's a trial

10   judge issue about whether, you know, Brandon's testimony would

11   be relevant and not more prejudicial than probative.  That's --

12   you guys could file a motion in limine and get that resolved.

13   Because if he's not going to testify, that would clear up any

14   conflict issue.

15      You mentioned having another attorney cross-examine

16   Brandon.  In *Agosto*, that was talked about.  However, that

17   court noted that a concern about the defendant in that case

18   was, if he were convicted, he could file an ineffective

19   assistance of counsel petition because backup counsel, we'll

20   call him or her, did not have a full degree of familiarity with

21   the issues and facts and, therefore, did not effectively

22   cross-examine the witness.  As a result, the court instructed

23   the district court to have the defendant waive his right to an

24   ineffective assistance of counsel claim, insofar as that right

25   be premised upon the conflict of interest issue.

1        So that, to me, would be the situation where if another

2    attorney were to cross-examine Brandon, Mr. Koistinen would

3    have to, at least based on my reading of *Agosto*, waive any

4    right to raise an ineffective assistance of counsel claim on

5    that issue.

6            MR. LONCAR:  Your Honor, that was part of the concern

7    with the timing of the issue being raised in the marijuana

8    retrial.  Brandon was due at that point to testify in two days,

9    and I doubt very much we'll be going to trial within several

10   months on this case.

11           THE COURT:  I'm sorry.  I missed that.  What?

12           MR. LONCAR:  That we wouldn't be going to trial for at

13   least several months in this case.  So preparing somebody else

14   for cross-examination is not under the time crunch that it

15   would have been in the scenario where I did feel like I needed

16   to withdraw because of that possibility, specifically, among

17   others.

18           THE COURT:  I'm just trying to -- if part of your

19   concern is that Brandon was lying -- I'm just wondering, you're

20   going to obviously have to be in communication with backup

21   counsel.  I would assume that person cannot cross-examine a

22   witness in a vacuum.  So there's -- to the extent confidential

23   information is an issue, it could leak to backup counsel as

24   well.

25           MS. DURYEE:  Your Honor, I think that the decision

1    that makes it -- we've had a decision come out since *Agosto*

2    that says you can't waive ineffective assistance of counsel

3    claims.  I know we redid all of our plea agreements in order to

4    put that in there, that that's something that's not waivable,

5    so I don't know that that remains an option.

6          THE COURT:  I have to say that I was a little

7    surprised when I read that, but I thought perhaps there was

8    something I was unaware of.  Okay.  If that's not even an

9    option, then it is what it is.

10          MS. DURYEE:  But I also want to put on the record that

11    the government disagrees strongly with the assessment by

12    defense counsel that this is a fiction, that we're seeking to

13    shoehorn relevant testimony.  I mean, if this case is going to

14    trial, it doesn't really matter to us who the defense counsel

15    is.  This isn't personal, even though it has been received that

16    way.  This is about us keeping a clean record and making sure

17    we don't have an appellate issue because of something messy

18    like this not coming up and being resolved by the Court.

19        So there is no other non-law enforcement witness that we

20    would be able to call or that would be able to testify about

21    the things that Brandon can talk about because he did live in

22    the home, both before and after the events in this case, but

23    also during and before the seizure of the phone, which happened

24    with the marijuana investigation.

25        So it's not a fiction.  I mean, as the Court probably

1    knows, the government attempts to get somebody to testify, a

2    layperson, a non-law enforcement witness, about people's

3    habits:  Who else comes and goes from the house?  Were they

4    security conscious?  What were their use habits?  And that

5    person in this case is Brandon.  The other people that lived

6    there were an infant and the defendant's wife, who has a

7    privilege.

8        So this isn't -- this isn't personal.  It's not a game.  It

9    is an effort by the government to keep a clean record.  This

10   conflict that existed at the state level is not something we

11   had anything to do with.  This is just our attempt to make sure

12   we don't have anything that's going to create an issue on the

13   back end of a conviction.

14           THE COURT:  You know, obviously the cases are very

15   different in terms of the current charges and what was charged

16   in state court.  And it sounds like what you're going to try to

17   elicit from Brandon is more of not direct evidence related to

18   the charge, but I guess more of -- I don't know if

19   circumstantial evidence is the right term, but background type

20   evidence.

21           MS. DURYEE:  And I will also just add that, you know,

22   based on what I had, the transcript of the hearing at the state

23   level that I submitted as an exhibit, it indicated there was no

24   waiver.  I don't think the waiver is really relevant at this

25   point even if there was one.

1        However, you know, I didn't get from that transcript that

2    the withdrawal pertained to the proximity of trial or anything

3    else.  What I got from that was that defense counsel didn't

4    feel comfortable with the scenario involving Brandon, was

5    potentially going to be impacted in his questioning involving

6    Brandon.  That's what he put on the record in that hearing and

7    that, you know, he believed that Brandon was making false

8    accusations.

9        So there is probably not confidential communication from

10   his representation that would be relevant to Brandon's

11   testimony in our case.  I don't think there would be overlap

12   there.  I think the conflict issue or the appearance of it

13   comes up from what I just summarized and what's in that record

14   that the Court has and the fact that there would apparently be

15   some attempt to cross-examine him about perceived dishonesty,

16   as to Mr. Loncar and as to the prior case, which I think

17   probably won't be admitted.

18       But, you know, it just looks a little messy, Judge, and

19   that's why we brought it out.

20           MR. LONCAR:  They're creating a mess.  And, Your

21   Honor, the first thing I said was why it was important at the

22   time, because since the day that I withdrew from representing

23   Jeffrey, I was able to disprove all three of the false

24   accusations that Brandon made against me, and I can do that any

25   day.  And other counsel can do that as well and show and prove

1    that the last time Brandon took the stand to testify against my

2    client, he lied, he committed perjury.  He did that because of

3    how much he hates his dad.  That's so relevant to

4    cross-examination of a witness.  I can't imagine that anything

5    other than prior sworn testimony against the same person could

6    be not relevant to impeachment of a witness.

7         THE COURT:  But how are you dealing with this issue of

8    divided loyalties?  Your duty of loyalty to Brandon continues

9    beyond your representation of him, and your calling him a liar

10   on cross-examination conflicts with that duty of loyalty that

11   continues.

12        MR. LONCAR:  Well, I'm calling him a liar because he

13   lied, right, and I'm calling him a liar because he lied under

14   oath.  In this court today I'm calling him a liar, so --

15        THE COURT:  I understand you're calling him a liar,

16   but you're calling your former client a liar, and you owe a

17   continuing duty of loyalty to that former client.

18        MR. LONCAR:  I don't think he has any stake.  Again,

19   that's where I see that this is not like the instance in the

20   first state court trial where his sentencing was still up in

21   the air.  So, you know, in retrospect, that could have posed

22   this problem, but --

23        THE COURT:  But you potentially want to get him

24   charged with perjury.  You want to get him a lawyer.  I mean,

25   you think he could get charged with perjury if he doesn't have

1    a lawyer.

2            MR. LONCAR:  I think he did commit perjury, and I

3    think he should be advised independently of that that, hey, you

4    might get questioned about statements you made under oath that

5    were false.  And I think that that should come from somebody

6    certainly other than me and certainly other than from the

7    government.

8            THE COURT:  Well, so there's maybe -- I kind of got

9    the sense that confidential information was really the big

10   concern here.  And I'm just highlighting in *Agosto*:  "The

11   lawyer may be tempted to use the confidential information to

12   the detriment of his former client, specifically on

13   cross-examination, or the attorney may overcompensate and fail

14   to cross-examine fully for fear of misusing confidential

15   information."

16       So those are the two concerns when it comes to

17   confidentiality.

18       I guess, with regard to the second, there could --

19   arguably, given Brandon has already filed a bar complaint

20   against you, that you may overcompensate and fail to fully

21   cross-examine him, for fear of another bar complaint.  Maybe

22   that's a bit of a stretch.

23       So I take it nobody's talked to Brandon at this point?

24           MS. DURYEE:  We have talked to Brandon.

25           THE COURT:  And have you --

1          MS. DURYEE:  We didn't talk to him about the conflict,

2     though, if that's what you're asking.

3          THE COURT:  No.  You've talked to him about the

4     proposed testimony that you would want to get from him?

5          MS. DURYEE:  Yes.

6          THE COURT:  Because there are situations regarding --

7     this, frankly, may be a reason to appoint a lawyer as well.

8     It's possible that he may be willing to waive a conflict based

9     on confidential information if the testimony is very narrow as

10    to what you're describing and he has a comfort level that his

11    confidential information provided to Mr. Loncar is not going to

12    come out during Mr. Loncar's questioning.

13       I take it the lies that you say he committed are just going

14    to be based -- what are they going to be based on, just hard

15    facts that exist?

16         MR. LONCAR:  Yeah.  He gave multiple statements.  In

17    short, he initially tried to blame things on his sister, then

18    on his dad.  When he did his free talk, he didn't mention

19    anything about the grow house that was within his exclusive

20    control.  He testified about that for the first time at the

21    trial.

22       He testified that it was his understanding that the free

23    talk was to tell the truth and the whole truth, but he left out

24    the part about how he said the entire grow operation

25    (inaudible), accounts related to the house or where Jeffrey

1    Koistinen was acquitted, and it was because of those lies.

2        He said "I don't recall" I want to say about 40 times on

3    cross-examination, including to things that were asked about

4    the day or two prior, 45 seconds earlier during his testimony.

5    I mean, somebody preparing to cross-examine him on all of that

6    is just going to be able to tear him apart.  And none of it was

7    based on anything that I knew independently from the very brief

8    time that I represented both him and Jeffrey.

9        And then I'd also point out that Jeffrey and Brandon were

10   estranged for six years, four years at the time of the -- more

11   than four years from the dates that start in the indictment.

12   And he didn't live with Jeffrey until the day that they were

13   both arrested on the state court charges, again.  And then

14   Brooke, Jeffrey's daughter, was not nearly as estranged, spent

15   more time with my client.  And it doesn't seem like the

16   government thought to talk to her.  They just, again, went to

17   the one where there's a conflict.

18        MS. DURYEE:  Your Honor, I'm not sure we need to

19   discuss who the government has talked to and not talked to, but

20   I will mention that I was present at the free talk with

21   Brandon.  As I recall, he was never even asked about that grow

22   house and that's why he didn't raise it, because it was a

23   conversation about something else.

24        So if that's an example of these bald-faced lies that this

25   witness supposedly tells, that's interesting but I don't think

relevant to this hearing.  What I'm hearing from defense are

efforts to disqualify our witness.  That isn't -- this isn't

the place for that.

THE COURT:  I'm with you on that.

MS. DURYEE:  And I'm just more concerned --

MR. LONCAR:  She went on a tirade for a long minute

about relevance.

THE COURT:  Hold on.  Hold on.

MS. DURYEE:  And I'm concerned about the second prong

of *Agosto*.  So I think the issue here, which is odd because

it's rare for this to happen, is that the first *Agosto* problem

happened already in state court and created an issue between

Mr. Loncar and Brandon, which led to Brandon bringing it up in

the hearing that Your Honor has the testimony from and then the

bar complaint.

And the three allegations that Mr. Loncar -- I don't know

anything about those.  I don't know what those allegations

were.  I don't need to know.  I know there's a finding of a

conflict, that there's a transcript where this attorney said,

"I can't do this.  I'm withdrawing."

And here we are again where we may have -- whether he

thinks Brandon is a good witness or not, we expect to have

Brandon as a witness.  Maybe we'll have Brooke too, but the

point is that it's not -- it's too soon to find the relevance

or to ask for a relevance determination for this witness's

1    testimony, but I believe he very much does have relevant

2    testimony.  And yet we do have to have a clear record about

3    this situation, and the situation is complicated by the fact

4    that that first prong of *Agosto* was already sort of triggered.

5         THE COURT:  When you say "first prong," which one are

6    you referring to?

7         MS. DURYEE:  That is the use of confidential

8    information to cross somebody.

9         THE COURT:  It was triggered by what Brandon said.

10        MS. DURYEE:  Well, it was triggered by Mr. Loncar's

11   cross-examination of Brandon, which then Brandon said wasn't

12   fair:  "That's stuff I told him in confidence, and then he was

13   using it against me on the stand."

14        MR. LONCAR:  It was triggered during a conversation

15   between the state prosecutor and Brandon.  He didn't think

16   about saying anything about what I asked him on confidential

17   information until it was two days before a retrial.  And the

18   examples of what he said I used confidential information for

19   were provably false.  He even testified differently than --

20        THE COURT:  But you withdrew from that case.  Why

21   didn't you just request a continuance?

22        MR. LONCAR:  I actually did.  I -- and the judge

23   didn't give us that opportunity.  It was -- that would have

24   been where I would have been able to prepare somebody else to

25   do that cross-examination.  I withdrew, again -- and I'm now

1    saying this for the third time, but she keeps on acting like I

2    didn't say it:  the timing.  This was the day we were supposed

3    to start jury selection.  Two days prior is when the prosecutor

4    raised this issue.

5            THE COURT:  I take it the trial didn't take place,

6    right?

7            MR. LONCAR:  It didn't.

8            THE COURT:  Right.  Because he got a new lawyer and it

9    took the new lawyer months to get up to speed.  But if you felt

10   like you didn't have a conflict, you just would have asked the

11   judge if -- let me not phrase it that way.  "Judge, I can prove

12   there's not a conflict.  I just need a continuance."

13           MR. LONCAR:  Yeah.  I mean, some of that part of it I

14   can prove hit me -- came later, as I was no longer in the

15   middle of preparing for a trial, which took up all of my time

16   during those days.

17           THE COURT:  Let me ask you this -- this is quoted from

18   the government's pleading, but I'm going to assume it's an

19   accurate quote:  "After some discussion about the subject of

20   cross-examination which had led to the witness's concern,

21   Mr. Loncar indicated he was uncomfortable with the fact that

22   the witness was in a position to make false accusations against

23   him, which led to believe he was not in a position to zealously

24   represent his client, such that he agreed to withdraw from

25   representation."

1      Assuming that's what you said, what do you mean you

2  couldn't zealously represent your client who's here today back

3  then?

4          MR. LONCAR:  I mean, expecting those false accusations

5  to be made to the state bar, it was -- and it happening right

6  then -- that was my first ever bar complaint in 13 years as a

7  lawyer -- seeing how that resolved alleviates that concern

8  seeing that I was able to prove through other information that

9  all of that was false, that's why it's not the same position

10  about that.  That's why I don't have that concern now.  If I

11  did have that concern, I would voice it.  I would declare a

12  conflict.  I would seek to withdraw from this representation.

13  I'm not doing that because, knowing what I know now and having

14  had the opportunity to review the accusations against me, prove

15  them false, that alleviates that concern for me.

16      And then also, because that case was related to the

17  representation, I felt there was a unique concern that Brandon

18  could evade any question he didn't want to answer by saying

19  that I would only know that from my brief representation of

20  him.  I don't think that's a concern in this case where

21  there's, I mean, again, nothing remotely relevant about his

22  knowledge of my client beginning well after the dates charged

23  in this crime, but certainly nothing that he would have said to

24  me in confidence relating to what he would be asked about in

25  this case.

1          THE COURT:  I mean, the problem with confidence is,

2    nobody knows what he told you except you and him.  The problem

3    is, it kind of leaks.  Like, he may have told you something at

4    the time that was pretty innocuous, and then that leads you to

5    believe -- or that gets factored into your analysis or your

6    questioning or even your belief that he was lying in the past.

7    And that's kind of the rub in these cases where you have

8    confidences at issue, because what we do is just have you tell

9    us what he -- what you talked about, but you can't do that

10   because of that same concern.

11      Ms. Duryee?

12          MS. DURYEE:  Well, there's a piece missing, and that's

13   obviously the piece we don't know about.  That pertains to the

14   allegations that Mr. Loncar says he's now proven false.  I

15   assume that's something to do with the bar complaint, but I was

16   not aware that it was dismissed or unfounded.

17      But I also -- the concern the government is left with is

18   the second *Agosto* scenario, which is the cross-examine that

19   Mr. Loncar thinks Brandon should be subjected to, to the extent

20   is informed by his alleged perjury in the last case, which the

21   cross-examination for was informed by privileged

22   communications.  For all I know, that was part of the "I don't

23   recall, I don't recall," because there was witness discomfort

24   there being cross-examined by somebody who used to represent

25   him.  So in a way, there's taint, as I see it.

1          THE COURT:  Why do you say that the cross-examine was

2    a result of privileged information?

3          MS. DURYEE:  That's what raised the issue.  That's

4    what Brandon reported.

5          THE COURT:  Right.  He reported that Mr. Loncar said

6    that's just not true.  So we don't know, right?

7          MS. DURYEE:  We don't know.  But to the extent that

8    that's what's going on, then regardless of who cross-examines

9    Brandon, if it's all about "you lied in this other case, and we

10   know you lied, and here's how we know you lied," that does

11   pertain to former representation or is kind of connected, it

12   seems like.

13      So to the extent there's any cross-examination of Brandon

14   about his perceived failure in his testimony in the first

15   trial, that doesn't clean up the conflict, I don't think.  My

16   primary worry is still what I put in my papers, which is, he

17   said he didn't feel like -- he was concerned about false

18   accusations, and he didn't feel like he could -- it wasn't a

19   good idea to go forward.  So he withdrew.  That's on the

20   record.  Here we are.  That's the part that really I think we

21   need to clean up.

22      But if there's cross-examination about him being a liar and

23   having lied in -- not told the truth, allegedly, in this last

24   trial, then to the extent that's informed by prior

25   representation, there's still a problem.  And I can't speak to

what those confidences were.  I mean, that's why it's a bad

scenario to end up in this place.

MR. LONCAR:  Maybe we don't keep saying that it was.

The three examples cited by Brandon, by his attorney in a

filing was, one, he said that he had told me that he was afraid

to go to prison.  I asked him whether he was afraid to go to

prison, on the stand, because I felt that, given his plea offer

of prison until he agreed to testify against his dad, the fear

of prison would be relevant.  On the stand, Brandon's response

to my question about whether he was afraid to go to prison was,

"I don't know about afraid, but I wouldn't want to go."  So

under oath, he said he's not afraid to go to prison.

Then later, as we're gearing up for retrial, he says, "Oh,

I told Loncar that I was afraid to go to prison.  That's why he

asked me that question."  Not only did he not tell me, not only

was that not why I asked him the question, he even said under

oath he wasn't afraid to go to prison.

The second was about a question pertaining to a neighbor

named Paul and a man cave.  Never heard those words from

Brandon.  I heard them from my client.  In fact, my typed-out

questions for cross-examination didn't have it.  It was during

a break that I hand-wrote that on to that question.  It had

nothing to do with anything Brandon ever told me during the

three meetings that we had, maybe, where we went over a

conflict waiver and invocation of rights:  "Don't talk to law

1    enforcement."

2        That's what -- our -- I didn't do detailed interviews of

3    either of them at that point.  Additionally, once Jeffrey was

4    arrested, for other reasons, it became clear -- so that same

5    day, just something that was discussed, that I would represent

6    Jeffrey if they were both arrested and charged.  And that was

7    understood at the first meeting, which, again, was only hours

8    before it became reality.

9        The third example -- I don't remember offhand, Your Honor,

10   what the third one was, but I know that it was, again,

11   inconsistent with his -- oh, well, about the man cave and Paul,

12   his answer to that on the stand was "I don't recall," when

13   later he would go and accuse me of only possibly knowing about

14   that, even though Jeffrey Koistinen knew about it.

15       The third example was that Brandon identified a line of

16   questioning regarding watching surveillance footage of Brooke

17   Koistinen, which was not information that I learned from him.

18   I was provided that video -- well, I'm not going to say

19   anything more about that, but I didn't get it from Brandon, and

20   I have proof of that.

21           THE COURT:  Well, you know, it's good that -- I know

22   you expressed frustration with the government for raising this

23   issue, but it's always best to get out in front of these

24   things.  The government's doing so, at least I believe, not

25   just to preserve a conviction if they get one, but to make sure

1    your client's rights are protected as well, in terms of having

2    conflict-free counsel.

3        The problem looking forward is, it's easier once

4    something's happened for an appellate court to look at it and

5    say, "Based on the record, everything was fine.  It doesn't

6    amount to ineffective assistance."  The concern, I think, going

7    forward on privileged information is, we don't really know

8    exactly what Brandon will testify to.  And it's certainly

9    possible that he could testify to something -- for instance,

10   the government is going to have him testify that, I guess, he

11   lived with his dad at certain periods of time that are relevant

12   to these charges.

13       It's very possible that he told you something very

14   different than that, again, something that may have seemed

15   really innocuous at the time.  The fact that he was living

16   somewhere, what does that have to do with the drug charges, for

17   example?  But it's something that could become incredibly

18   relevant for your cross-examination, and you would not be able

19   to cross-examine him on that because it's confidential

20   information.

21       That's where this becomes, I think, really, really

22   difficult because we just don't yet know.  And if you're in the

23   middle of trial, what are you going to do at that point?  You

24   can't reveal confidences, and you can't effectively represent

25   your current client by not asking that question.  So it is

1    incredibly tricky.

2        Let me ask:  Ms. Duryee, what do you think about

3    Mr. Loncar's request that Brandon be appointed counsel, maybe

4    both for -- I'm not -- actually, maybe it would help on the

5    conflict thing, maybe protect him on perjury.  Do you have any

6    feelings on that one way or the other?

7            MS. DURYEE:  You know, I took Mr. Loncar's suggestion

8    to pertain only to his feeling that Brandon would be committing

9    perjury and not with respect to seeking counsel for other

10    reasons, but --

11            THE COURT:  Well, I'm just thinking, in the event

12    Brandon were to want to waive any conflict, it might be better

13    to have a counsel waiver, assuming a waiver is needed.

14            MS. DURYEE:  He was represented at the time the

15    conflict was raised at the state level.  He is no longer

16    represented now, I don't think.  We could ask him if he would

17    be willing to waive the conflict, but I'm not -- I wouldn't

18    expect that under the circumstances.  I mean, considering the

19    way it all came out after the state trial, I'm assuming that he

20    would say no, but we could ask him that.  I could ask his prior

21    counsel to look into that.

22            THE COURT:  Well, I could just -- I mean, I could just

23    appoint him CJA counsel who might help.  I'm not sure you want

24    to start talking about waiving conflicts with him.

25            MS. DURYEE:  I'm pretty sure I don't.

UNITED STATES DISTRICT COURT

1          THE COURT:  And then he has a lawyer for, potentially,

2     both reasons.

3          So the one case I have to point out that really I think

4     presents the biggest problem for you, Mr. Loncar, is this Ninth

5     Circuit case *Vargas-Martinez*.  Now, granted, the attorney had

6     been representing two defendants, but what the court ultimately

7     said was that "the district court was correct in ordering

8     substitution of counsel for the defendant on the basis that the

9     dual representation created inescapable conflict of interest

10    that had not been waived by both co-defendants.  Since the

11    former client was a prosecution witness, the presence of

12    counsel for the defendant presented the possibility of

13    disclosure of confidential communications."

14         Again, it's not -- it's just the potential, not so much

15    that you will.  And there's kind of a presumption, and there's

16    one case that talks about it.  I think it might be *Agosto*.  In

17    that case, the Ninth Circuit said the district court erred in

18    applying this irrefutable presumption that confidences were

19    disclosed, but that was in the context of both the lawyer

20    avowing to the Court that no confidences were going to be

21    disclosed and six grand jury witnesses -- there were multiple

22    conflicts in this -- came forth with affidavits saying they

23    didn't consider their communications to be confidential.

24         So I think there is this presumption that creates a real

25    issue in the absence of Brandon coming forward and saying,

1   yeah, either he waives it or -- and even less likely, that no

2   confidences pertaining to what he's going to be questioned

3   about were disclosed to you.

4        So what I'll do -- and I apologize; for some reason this

5   attachment did not get printed.  In any event, I'd like to see

6   the transcript of the cross-examination and the conflict waiver

7   form as well.

8        Let me think about whether -- I'm leaning towards

9   appointing a lawyer for Brandon, a lawyer to represent him as a

10  witness for the reason Mr. Loncar identified, but also for the

11  reason that I brought up as well.

12       I guess I'm still thinking about having a backup counsel.

13  Have you explored that at all yet in terms of finding someone

14  and thought about how you would kind of give that person what

15  they need without treading into any confidences?

16       MR. LONCAR:  Yes, Your Honor.

17   So because my client did retain substitute counsel for the

18  state marijuana charge, he has someone who's familiar with much

19  of the investigation in this case, a lot about Brandon.  He'll

20  be very familiar with trial testimony from the first trial

21  because he's preparing to do a retrial on that case.  So that's

22  one option.

23       But, again, those materials can be provided to anybody

24  else.  There are other counsel that we would consider bringing

25  in.  And I suppose the sooner the better, as a hearing on a

1    motion in limine on that issue would be helpful.  But simply

2    put, there's nothing that I know that's not in police reports,

3    recorded statements, testimony, nothing that I know from

4    Brandon, so it wouldn't even be possible for me to infect

5    substitute counsel for that purpose.

6            THE COURT:  I know, but, again, I just go back to you

7    don't know what you know until either he testifies or the

8    government gives you a report of their interview with him.

9    Again, that could easily come up at a trial.  I mean, that's

10   the issue, right, because -- I mean, it would be easy if you

11   said, well, I know this about -- I mean, you would have

12   withdrawn, right, if you knew something about Brandon that was

13   just so juicy you were going to use it in cross-examination and

14   you knew it from confidential communications, you'd be out of

15   the case.  No doubt you would withdraw like you did in the

16   state case.

17       But it's just the uncertainty of whether something could

18   come up that seemed real innocuous or benign at the time when

19   you met with him, however brief.  To me, that's kind of the

20   concern going forward.  At this point, I don't really know how

21   to deal with it.  And it's tough too because -- it's incredibly

22   tough because Mr. Koistinen has the right to counsel of his

23   choosing, but that does give way when there is a conflict.

24       The other thing about backup counsel -- and I guess I want

25   to ask the government for its position on that.  I don't know

about this state court attorney, but I guess I might be a
little careful to the extent, if you -- generally when somebody
gets a new attorney, the old attorney essentially turns over
the file and brings the new attorney up to speed.  So you could
theoretically create the same problem unintentionally.

Ms. Duryee, do you have any thoughts about this backup
counsel notion?

MR. DURYEE:  The only place -- I have never heard of
such a way to address a conflict, and the only place I ever saw
anything about it was in the *Agosto* case.  But, as I said, I
don't think that we can waive an ineffectiveness issue.

But the question is this:  if the new attorney or
Brandon -- the person that's assigned to cross-examine Brandon
asks a question that Mr. Loncar believes is a lie, then what
happens?  Does he not say anything, based on his prior
representation?  Does that make him ineffective?  You know, if
all of the determination that we've heard for
cross-examination, to the extent that all of these opinions
come from Mr. Loncar based on his relationship with Brandon and
prior -- and the case, I don't see how they don't bleed into a
new attorney.

Now, I get what the Court said, and that is, if Brandon
would waive a conflict, it wouldn't be an issue.  But beyond
that, I -- I can't say with real confidence that there's not
still some taint from that representation.  It's an unusual

1  position to be in, where there's already been cross-examination

2  based on prior -- at least from the witness's standpoint, from

3  prior representation.  And, you know, it certainly seems to

4  have informed counsel's opinions about the nature of Brandon's

5  testimony and would, no doubt, inform most people's opinions

6  about someone if they were responding to a bar complaint.

7       But then this counsel is a witness about the terms of their

8  communication, and that's exactly what nobody is supposed to

9  really go into.  So I don't know how -- if there's a wall

10 situation with that attorney.  I'm just not familiar with that

11 resolution.  It's not something that I've ever experienced.

12          THE COURT:  I haven't either, and, actually, that is a

13 really good point because you can't really -- if you say,

14 "Brandon is lying; I know that because of what he told me

15 during one of our meetings," you're in the same spot, right?

16 You can't sit on your hands.  Well, you can, but that's not

17 going to be zealously representing your client in that

18 situation.

19      I'm trying to think this through.  If I appoint an

20 attorney, it's possible I could have an ex parte hearing with

21 Brandon and his attorney where I flesh out from him what he

22 thinks was confidential.  But I don't really know how that

23 would really work because I imagine that either way I decide,

24 this is probably going up to the district court, and you guys

25 are going to need, presumably, access to that.

1    So I think all I can do today is basically nothing.  I'm

2    going to give -- give me the conflict waiver and the

3    cross-examination from state court, and then let me think about

4    appointing an attorney for Brandon.  Then I'll circle back with

5    you all.

6        You may want to get this, whether Brandon is going to

7    testify or not, resolved from the district court sooner than

8    later, just so we know if this is going to be -- just so we

9    know if this conflict issue is even an issue.  Based on what

10   the government is saying, what they want to call Brandon for,

11   it's hard for me to believe that he would not be allowed to be

12   called as a witness, but that's not my issue or concern at this

13   point.

14       So what do you guys think about the motions to suppress

15   that are set for May 7th?  Assuming this conflict issue isn't

16   resolved then, do you think we should just go forward?

17       Brandon's not, I assume, a witness at the motion to

18   suppress.

19            MR. DURYEE:  We didn't intend to call him.  In fact,

20   we're fine going forward on that date.  I did see an email from

21   counsel this morning about subpoenas, which I think -- our

22   position actually is that on the documents alone there are

23   legal questions.  But that's not to say he can't call a

24   witness.  Maybe he has a witness that's going to say the phone

25   was in some other place.

1      But we're ready to go forward.  We don't plan to provide

2  witnesses with respect to the motion to suppress electronics,

3  and I think there is already ample testimony that has been

4  attached to the motion to suppress the blue iPhone.  But I

5  still think it's actually a legal argument that's presented.

6      THE COURT:  What are your thoughts on that motion to

7  suppress going forward?

8      MR. LONCAR:  Oh, yeah, well, I mean, I'd just note --

9  maybe I'm missing it, but I did look on the docket and I still

10  don't see it as having been set.  And it wasn't in my emails.

11      THE COURT:  No.  I have a note on the calendar there's

12  a tentative date of May 7th at 1:00.  I think that's just

13  emails between you guys and my J.A.

14      MR. LONCAR:  Yes, I would be fine with keeping that.

15  As to whether witnesses are necessary, I'm somewhat in

16  agreement with respect to the electronics motion.  However, the

17  blue iPhone motion I think does have some factual issues as to

18  when, where and by whom the phone was actually seized and how

19  that means that it does or does not fall within the warrant or

20  an exception to the warrant.

21      So I -- when I started practicing in Arizona, I learned

22  that apparently defense attorneys don't subpoena police

23  officers to hearings often.  I was yelled at by a state court

24  prosecutor, by town counsel for Marana, just for even trying to

25  do it.  But the reason for that email was to confirm the date

1    so that I could get those subpoenas issued.

2            THE COURT:  Okay.  Well, I'm sure I've allocated the

3    whole afternoon, so if you have witnesses, or don't, we should

4    have enough time.

5        I'll get in touch if I think -- within this week or early

6    next week, if I think that the suppression hearing shouldn't go

7    forward until the conflict issue is resolved.  I'm just trying

8    to think through what the downside is.  The only downside I

9    potentially see -- or maybe not the only one -- is that you do

10   the suppression motion, and regardless of the way it goes --

11   well, I guess if it goes in your favor, I guess you'd win.  But

12   let's say it goes against you and then there's a finding that

13   you have a conflict and there's a new attorney.  Could that new

14   attorney -- could something come back on you, Mr. Loncar, as a

15   result of going forward on those motions with a conflict?

16       I'm just not seeing how that could materialize, given that

17   Brandon's not a witness and it seems like for the most part

18   they're legal issues.  So I guess if you're not concerned, then

19   I won't be concerned.

20           MR. LONCAR:  Thank you, Your Honor.

21       Then just one other question about the documents the Court

22   has requested.  I would be comfortable with filing the

23   transcript of the trial testimony, but with respect to the

24   conflict waiver, would I be able to email that ex parte?

25           THE COURT:  You can file that ex parte under seal.

1   And then if I think that it's something that becomes incredibly

2   relevant and the government needs to see that -- and it may

3   come to that -- if you have an objection to that, we'll have a

4   hearing; and if you don't, we'll get it to the government.  But

5   at least in the first instance, you can file that ex parte

6   under seal so I can look at it.

7           MR. LONCAR:  Thank you, Your Honor.

8           THE COURT:  Anything else?

9           MR. DURYEE:  Sounds like we may get a written -- some

10  communication from the Court in maybe a week or so?

11          THE COURT:  Yeah, regarding the suppression issue for

12  sure.  I think we should just plan on going forward.  I'm just

13  trying to think of how it could come back to bite anyone, and

14  I'm not sure that it would.  I don't think it would.  I think

15  we should keep moving forward.

16      And I guess, given what's going on, you guys are pretty

17  comfortable that there's not going to be a nontrial disposition

18  in this case?

19          MR. DURYEE:  We made a favorable offer, and my

20  understanding is that it's been rejected.

21          THE COURT:  Again, the only reason I'm bringing that

22  up is that we're going to jump through a lot of hoops, if the

23  case was going to resolve in a guilty plea.  Not that I'm not

24  willing to do that -- and we should -- but just keep that in

25  mind before we get too far down the road if we're looking at a

1    non-trial disposition.

2        So, Mr. Koistinen, I realize this is probably frustrating

3    for you, but this is an issue that ultimately impacts your

4    rights.  So that's why it's taking -- well, it's a little

5    complicated and it's something we all need to think through.

6    Okay?

7            THE DEFENDANT:  Thank you, sir.

8            THE COURT:  You're welcome.

9            THE CLERK:  (Inaudible.)

10           THE COURT:  Mr. Loncar, what do you think, end of the

11   week?  Is that realistic?

12           MR. LONCAR:  I can do it in 15 minutes.

13           THE COURT:  Say end of the week, just to be safe.

14       Thanks, everyone.

15       (Hearing adjourns at 2:44 p.m.)

16                              *   *   *

17

18

19

20

21

22

23

24

25

1                **C E R T I F I C A T E**

2

3

4          I, Anni Bryan, court-approved transcriber, certify

5    that the foregoing is a correct transcript from the official

6    digital sound recording of the proceedings in the

7    above-entitled matter to the best of my ability.

8          Dated this 30th day of May 2025.

9

10

11                                    _____/s/Anni Bryan_____

12                                    Anni Bryan

13

14

15

16

17

18

19

20

21

22

23

24

25