```
 1                    UNITED STATES DISTRICT COURT

 2                        DISTRICT OF ARIZONA

 3   United States of America,      )
                                    )
 4              Plaintiff,          )  4:23-cr-1495-AMM-EJM
                                    )
 5         vs.                      )
                                    )  Tucson, Arizona
 6   Jeffrey Allen Koistinen,       )  July 30, 2025
                                    )  3:24 p.m.
 7   _____Defendant. __  )

 8                    TRANSCRIPT OF PROCEEDINGS
                          STATUS CONFERENCE
 9
               BEFORE THE HONORABLE ERIC J. MARKOVICH
10                UNITED STATES MAGISTRATE JUDGE

11   APPEARANCES:

12   For the Plaintiff:
          Nathaniel Walters
13        U.S. Attorney's Office
          405 West Congress Street, Suite 4800
14        Tucson, AZ 85701

15   For Defendant Jeffrey Koistinen:
          Nicholas M. Loncar
16        Tucson Defenders
          2030 East Broadway Boulevard, Suite 123
17        Tucson, AZ 85719

18   For Brandon Koistinen:

19        Michael Harwin
          Michael Harwin Attorneys
20        100 North Stone Avenue, Suite 1005
          Tucson, AZ 85701
21
     Transcribed by:
22        Cindy J. Shearman
          405 West Congress Street, Suite 1500
23        Tucson, AZ 85701
          520-205-4286
24
                  Proceedings were digitally recorded
25            Transcript prepared by transcriptionist
```

```
 1                    P R O C E E D I N G S
 2              (Call to order of court, 3:24 p.m.)
 3              CLERK:  In criminal case number 23-01495, Jeffrey
 4    Allen Koistinen, on for a status conference and motion hearing.
 5        Counsel, please state your appearance.
 6              MR. WALTERS:  Good afternoon, Your Honor.  Nate
 7    Walters on behalf of the United States.
 8              THE COURT:  Good afternoon.
 9              MR. LONCAR:  Good afternoon, Your Honor.  Nicholas
10    Loncar on behalf of Jeffrey Koistinen, who's present in
11    custody.
12              THE COURT:  Good afternoon.
13        Good afternoon, Mr. Koistinen.
14              THE DEFENDANT:  Good afternoon.
15              MR. HARWIN:  Good afternoon, Your Honor.  Michael
16    Harwin on behalf of Brandon Koistinen, who is present
17    telephonically.
18              THE COURT:  Good afternoon.
19        Good afternoon, Brandon Koistinen.
20              BRANDON KOISTINEN:  Good afternoon.
21              THE COURT:  Okay.  All right.  If it's okay, at
22    various points I may refer to Brandon and Jeffrey if that's
23    okay just so there's no confusion.
24        Okay.  So I had, last week I had an ex parte hearing with
25    Mr. Harwin and Brandon Koistinen to talk about some matters
```

1    relating to this potential conflict.  Based on that meeting,

2    I'm cautiously optimistic we may be able to come to some

3    understanding or agreement but, but let me ask you, Mr. Harwin,

4    has anything changed from your perspective given what we talked

5    about?

6         MR. HARWIN:  Nothing's changed.

7         THE COURT:  Okay.  So, Mr. Loncar, you had filed that

8    motion to preclude Brandon from testifying at trial.  In the

9    response, Mr. Walters laid out essentially five bullet points

10   of what Brandon -- he would anticipate Brandon testifying

11   about.  And I'll just -- that Jeffrey Koistinen had used Skype

12   for years prior to his arrest; the computer was located in his

13   personal office; he frequently entered his office, closed the

14   door, and sometimes locked it from inside; he never observed

15   anyone else use the computer, including his spouse; and that he

16   was extremely security conscious and a techie guy.

17   So the testimony, the proposed testimony is very narrow.

18   And it doesn't go to, you know, child porn in and of itself.

19   It's just -- and assuming he's allowed to testify to those

20   things, the testimony is so narrow, the conversation that I had

21   with Brandon was, okay, you had -- he had raised some concerns

22   about you using confidential information on cross-examination

23   during the state trial.  And I have a pleading from Trevor Hill

24   in that state case and there were three alleged instances where

25   confidential information was used:  the conversation about a --

1  conversation with a man named Paul who lived near Fallen

2  Shadows property; question regarding watching surveillance

3  footage of Brooke Koistinen; and then about a question asked

4  about if Brandon was afraid of going to prison.  And what

5  Mr. Hill represented is Brandon recalls discussing all three of

6  those matters with Mr. Loncar.

7      So, those issues, those three, I guess, lines of

8  questioning that came up in the state trial have no relevance

9  or bearing on the federal trial and I can't see that there

10  being any testimony about that.  And when I talked to Brandon

11  and Mr. Harwin last week, I asked if, if the proposed testimony

12  in the federal case, which I outlined to them that I just

13  outlined for you all, if there is any -- if Brandon has any

14  concern that Mr. Loncar may have confidential information

15  related to that subject area and generally in those specific

16  points, and Brandon's, you know, his representation was that,

17  no, that he doesn't have an issue testifying about that and he

18  never had any conversations with Mr. Loncar about, you know,

19  anything related to the federal charges or Jeffrey's, you know,

20  computer usage and skills with technology.

21      So, it would seem to me as if, if Brandon's testimony is

22  going to remain that narrow in the federal case, and given

23  Brandon's representation that no confidential information was

24  discussed with Mr. Loncar regarding that subject area or

25  subject areas, it would seem to me that we could potentially

1  protect Jeffrey Koistinen's right to counsel of his choosing

2  and still make sure that the attorney-client privilege and duty

3  of confidentiality are maintained to Brandon.

4      So I guess I'd like to hear what your thoughts are about

5  that and, Brandon, at this point, did I mischaracterize

6  anything or Mr. Harwin -- let me ask Mr. Harwin.

7      Did I mischaracterize anything or forget anything?

8          MR. HARWIN:  I don't think so, Judge.  I think you got

9  it right.

10         THE COURT:  Brandon, was that your recollection of our

11 discussions last week?

12         BRANDON KOISTINEN:  Yeah, that's correct, Your Honor.

13         THE COURT:  Okay.  So, I don't know, what do you,

14 Mr. Walters, Mr. Loncar, what do you think about that?

15         MR. WALTERS:  Your Honor, I don't necessarily have an

16 issue with what the court is saying and we don't necessarily

17 disagree with that part of the analysis but I do think that

18 there is a part of the analysis that is still missing from

19 this.  And that is the fact that at previous hearings, at least

20 once, perhaps twice, Mr. Loncar has noted his intent to

21 essentially accuse Brandon of perjury on the stand.

22     Frankly, I think it's unclear to the government whether the

23 basis for that perjury allegation comes from any of those

24 things that were outlined in Mr. Hill's pleading at the state

25 court case or not.  But I think, number one, that would be

1  problematic I still think for a conflict, for conflict

2  purposes.  But I think on the other hand, too, I don't think

3  that what the court is -- respectfully, I think what the court

4  is still not taking into account is the fact that regardless of

5  what his testimony is at this point, if Mr. Loncar intends to

6  accuse Brandon of being a perjurer, that could have issues in

7  terms of whether he's now violating his ethical obligations to

8  a former client because he is putting himself in a directly

9  adverse position to his client, to a former client, by calling

10 him a perjurer on the record in front of a jury.

11      And so I do think that those are still some issues that may

12 need to be, that may need to be fished out before there's a

13 definitive conclusion on whether a conflict exists or not.

14          THE COURT:  Well, that -- you stole my thunder to some

15 extent because that is what -- I do recall Mr. Loncar, you

16 know, he asked for Brandon to have counsel because of a concern

17 for perjury.

18      So I think, Mr. Loncar, I just kind of need to hear from

19 you.  I mean, if -- I think that there could be a distinction

20 between Mr. Loncar attacking Brandon's credibility on the

21 subject areas that are set forth by you, Mr. Walters, as

22 opposed to him attacking, you know, trying to attack

23 credibility based on prior purported false testimony.

24      Frankly, I don't even know how that prior testimony, I

25 don't even see how that would potentially be admissible at a

1    trial.  I mean, you'd have to have a mini trial on whether

2    Brandon perjured himself in the state court trial.  But --

3        So, Mr. Loncar, what do you think?  What are your thoughts

4    about what I've said and what Mr. Walters has said?

5            MR. LONCAR:  Well, so as -- I recognize that there is

6    a sort of blind spot.  There's the issue where even though the

7    court has discussed these particular issues of Brandon's

8    testimony, that Skype use, the computers, closed door and

9    office, whatever, there's still an unknown, there's still this

10   -- I could ask a question and Brandon could believe that it was

11   based on something that he told me at some point, even within

12   this kind of limited testimony.

13       So, accordingly, what our intention is and what -- and I

14   did discuss this with the state bar ethics hotline.  Our

15   intention would be for Mr. Koistinen, Jeffrey Koistinen, to

16   retain separate counsel for the purpose of cross-examining

17   Brandon in the event that he does testify.

18           THE COURT:  Yeah, I don't see that as a viable option

19   because that counsel can't -- I mean, that counsel can't

20   operate in a vacuum.  That counsel would have to -- he would be

21   or she would be ineffective by not fully knowing the case and

22   having conversations with you.  That's, that's not going to

23   fly.  I mean, state bar counsel may have said that but that's

24   not something I would agree with.

25       And I understand your opinion from the state bar counsel is

1    that this is not the same or a substantially related matter.  I

2    think we can all agree that's the case.  But that's not the --

3    where the conflict flows from.  It's confidentiality.

4        So, if you are concerned that Brandon's going to make an

5    allegation that some questioning is based on confidential

6    information, then you've got to get off the case like you did

7    in the state case; I don't see a way around it.  I mean,

8    Mr. Walters has set forth five -- and he's represented in his

9    responsive pleading that he's not going to get into character

10   evidence, whether Mr. Koistinen was a good father.  It's

11   basically access, you know, to devices, and who used them.

12       And your position might be that, hey -- it sounds like your

13   position is Brandon didn't even live with his father at that

14   time.  Provided you learned that from Jeffrey and not Brandon,

15   that would be fair cross-examination.

16           MR. LONCAR:  Well, confidentiality is broader than

17   privilege and so, I mean, I, I -- even if I learned it from

18   Jeffrey that Brandon didn't live with them, I could see that

19   still potentially being something that would be covered under

20   confidentiality because confidentiality is not just what

21   Brandon told me but what I learned about the matter during the

22   representation.

23           THE COURT:  Right.  But if you learned it from

24   Jeffrey, I mean, of course it's confidential but he's going to

25   agree that you can use that; he can waive confidentiality for

1  that.

2      MR. LONCAR:  Respectfully, Your Honor, I think it's

3  different.  I think that if I learned it from Jeffrey but it

4  was while I was representing Brandon, that's still -- my duty

5  of confidentiality to Brandon is not just limited to what he

6  told me.  That's strictly -- that's attorney-client privilege.

7  So what Brandon told me I can't use, I can't disclose.  But

8  confidentiality is broader than that.

9      So I don't know whether -- and, Your Honor, I mean, I

10  believe that the other counsel who would come in for that --

11  for the purpose of doing the cross-examination could prepare by

12  looking at everything; it's not a particularly voluminous case.

13      But, I mean, as to the court's inquiry about specifically

14  whether I would have a concern about Brandon making an

15  accusation, I would.  And that's why what I do want to do is

16  have someone else conduct that cross-examination.  But --

17      THE COURT:  I mean, I could see that accusation coming

18  regardless.

19      MR. LONCAR:  Even if --

20      THE COURT:  Even if there was some other counsel doing

21  the cross.  Because -- I'm just trying to envision the

22  cross-examination by another attorney or even you.  So Brandon

23  testifies as the government has represented he will testify,

24  okay, that, you know, Jeffrey was familiar with Skype, he

25  locked his office door, nobody had access to this stuff.

```
 1    Presumably the other counsel would talk to Jeffrey and say:

 2    Hey, you know, tell me about this stuff.  And on cross he'd

 3    say, he'd say to Brandon:  Isn't it true that you didn't live

 4    with Jeffrey during whatever time frame?  And Brandon would

 5    say:  No, that's not true.  I mean, what do you do with that?

 6           MR. LONCAR:  I don't see how that's any different than

 7    if I withdrew and next counsel talked to Jeffrey and had the

 8    same information.

 9           THE COURT:  Right, but you have concerns about

10    confiden -- the thing is is that there's always going to be --

11    there's always something, there's always a big matzo ball

12    hanging out there of how this other counsel learned of that

13    information, through Jeffrey alone or through conversations

14    with you just discussing the case.

15        I mean, I don't know, you know, I actually didn't ask

16    Brandon this question about whether -- well, and I guess you're

17    saying it doesn't really matter whether you had conversations

18    with him about if he lived, you know, when he lived with his

19    father and so forth.  But you're saying that your view of

20    confidentiality, it doesn't really matter because it's still

21    confidential to him.

22           MR. LONCAR:  Correct.

23           THE COURT:  To Brandon.

24           MR. LONCAR:  Right, so I think he would have to waive

25    that as well and not just Jeffrey.  But having been subject to
```

1  multiple false accusations already, I, I would not want to

2  conduct the cross-examination.

3          THE COURT:  Well, let me ask you, I read -- I read a

4  case where a court suggested that another attorney could

5  conduct a cross-examination.  I don't think I've ever -- I came

6  across a case that said that that was fine.  Have you guys seen

7  a case where a court's approved that?

8          MR. WALTERS:  I don't believe I have, Your Honor.

9          THE COURT:  I just don't remember the case.

10         MR. LONCAR:  Not off the top of my head, Your Honor.

11  I, I don't know that I've necessarily looked either but, no, I

12  can't name a case.

13         THE COURT:  Well, let me ask you, Mr. Walters, and if

14  Mr. Harwin wants to chime in, what are your thoughts about

15  this, some other lawyer who Mr. Koistinen would have to retain

16  but, yeah?

17         MR. WALTERS:  Your Honor, I don't really have anything

18  else to add on top of what you've already said.  The government

19  shares those exact same concerns about another lawyer, another

20  lawyer conducting the cross-examination.

21      I do want to point out that, you know, Mr. Loncar

22  referenced that he didn't think that there would be a

23  difference between this attorney coming in for a limited

24  purpose to cross-examine Brandon, cross-examine Brandon,

25  reviewing all the materials and then talking to Jeffrey

1  Koistinen and then conducting the cross-examination.  The

2  obvious big difference there is that there is no implication

3  or -- there is no implication, there is no suggestion that any

4  of that information then was learned through anybody's

5  representation, whether it be privileged or confidential.  And

6  so there's a huge difference in that.  I think, you know,

7  having just a brand-new attorney on the case, looking at this

8  fresh, talking to Jeffrey Koistinen fresh preserves the

9  integrity of the case not only for purposes of appeal but for

10  purposes of a potential 2255 if the defendant is convicted

11  obviously for either of those.

12      And I think at this point, if Mr. Loncar is uncomfortable

13  cross-examining Brandon Koistinen because there may be at the

14  very least allegations of a breach of privilege or

15  confidentiality, then I think the prudent thing to do is for

16  Mr. Loncar to withdraw from the case or, frankly, the court

17  order that he be withdrawn from the case for a conflict of

18  interest purpose because from the government's perspective, it

19  seems that he is almost acknowledging at this point that there

20  is, there is the potential for a conflict of interest to occur

21  during the course of this trial.

22      And, as I pointed out in my response to his motion to

23  preclude Brandon, if we get to a point in trial where all the

24  sudden now this is an issue, we are talking about a mistrial;

25  we have to start this entire process all over again, pick a new

jury.  And that could happen at any point during the course of

the case.  And so the most prudent, safest course of action

here is for Mr. Loncar to get off of this case so that

Mr. Koistinen, Jeffrey Koistinen, is able to have the

assistance of conflict-free representation, which is a right

guaranteed to him by the Sixth Amendment by the US

Constitution.

So those are my thoughts, Your Honor.  And I have nothing

more to add.

THE COURT:  Okay.  I'm sorry.  Mr. Loncar, did you

want to --

MR. LONCAR:  Yeah, I guess I'm still trying to figure

out what right the government would be pointing to, what

constitutional right they have in calling an irrelevant witness

over my client's right to the counsel of his choosing.  It --

when they, when they did this, the government, when they told

me, hey, we're going to be calling Brandon in this completely

unrelated case, it was so obvious that they had just spoken to

Nanette Morrow who said, oh, well, hey, if you don't want to

have to deal with those suppression motions, why don't you just

file a motion for a conflict, that would end it.

The reason why they shouldn't have is because this case is

not related to anything that Brandon knows about.  Brandon had

no information about any of what Mr. Koistinen, Jeffrey

Koistinen, is charged with until after his arrest.

1        THE COURT:  I think that, I think everybody agrees

2   with that.  But the government wants to basically say that, you

3   know, establish through Brandon that, no, you know, neither he

4   nor, I guess, anyone else used the devices on which the

5   contraband was found.

6      And if you think Brandon's testimony is irrelevant, then

7   I'm not so sure what, you know, what you're going to be

8   attacking him on.  I mean, it just seems like from your

9   perspective, it's neither here nor there if they're not getting

10  into character evidence and trying to dirty up your client.

11       MR. LONCAR:  Well, there's a big difference between

12  relevant knowledge and relevant testimony.  Somebody can give

13  testimony that appears relevant without having relevant

14  knowledge and that's the concern, and that's the problem, and

15  that's actually the situation here.

16     Because as when we were here last, Ms. Duryee said that

17  they were going to be filing a superseding indictment with new

18  dates so I asked for those dates.  Well, there still hasn't

19  been a superseding indictment but there has been a new report

20  with apparently new dates of chats.  Well, those dates are also

21  still during a six-year period of estrangement between Brandon

22  and Jeffrey Koistinen.

23     So the fact that they even are trying to call Brandon

24  should reek of a problem, of the government trying to create a

25  conflict in a case that doesn't have one.

1          THE COURT:  Well, I don't think the government is

2    trying to create a conflict, it's trying to protect the -- your

3    client's rights in part but also the integrity of the process,

4    and Brandon's right to have his confidences maintained.

5          So, Mr. Harwin, I'm reluctant to ask Brandon this question

6    but would you mind coming to the podium, and can you just tell

7    me if you -- what your thoughts are about this?  So --

8          Oh, Mr. Loncar, let me ask you as well, this, you had

9    mentioned that, you know, you're going to, you know, you wanted

10   Brandon to have counsel because of perjury issues.  What's that

11   about?  I mean, how do you plan to get into that stuff?

12         MR. LONCAR:  Well, it seems Brandon wants to testify

13   in this case and it would have -- I think that testimony

14   against his father previously where he made statements that

15   were inconsistent within that testimony as well as inconsistent

16   with prior statements and other evidence in order to convict

17   his father would be relevant to a motive to lie in this trial.

18         THE COURT:  So you want -- you're going to try to get

19   into his state court testimony?

20         MR. LONCAR:  Well, I think that's one of the biggest

21   problems with having Brandon testify, period, is you've got

22   someone who has previously told false information to try to get

23   Jeffrey Koistinen convicted in one case and then let him

24   testify in an unrelated matter about things that he doesn't

25   know about?

1          THE COURT:  Yeah, but, again, you're alleging that it

2    was false testimony.  The issue is, how are you going to prove

3    that up at a trial, assuming you're allowed to get into that?

4    I mean, how are you going to prove it's false?

5          MR. LONCAR:  There are moments in that transcript,

6    Your Honor -- it's been months since I've looked at it but

7    there are moments in that transcript where Brandon says one

8    thing and then less than a minute later the opposite.

9          THE COURT:  Well, Mr. Harwin, given that comment, I'm

10   not sure I even need to ask Brandon this question, but I

11   thought Mr. Loncar was concerned that the duty of

12   confidentiality is broader than the attorney-client privilege.

13   So even if he learned from Jeffrey the periods of time where

14   they lived together or didn't live together, it would still be

15   confidential as to Brandon because he learned that during the

16   course of his representation of Brandon.

17      In theory, Brandon could waive any -- could waive that

18   confidentiality with, you know, again, to the extent Mr. Loncar

19   learned that from Jeffrey and that could, you know, maybe give

20   Mr. Loncar some solace in the fact that he can get into that,

21   the living arrangements and so forth, based on information that

22   came solely from Jeffrey.

23      So what I was going to try to talk to Brandon about, and

24   maybe this isn't the time to do it, maybe you need to talk with

25   him about that, is whether he'd be willing to, you know, waive

```
 1    any confidentiality with respect to that narrow area.

 2            MR. HARWIN:  Well, I can tell you that, based on my

 3    knowledge, Brandon's not willing to waive any confidentiality.

 4            THE COURT:  Okay.  And -- but as we discussed, if the

 5    testimony was limited to what the computer usage and access,

 6    your understanding and mine, talking to Brandon, is that there

 7    were no confidential communications about that stuff that would

 8    need to be waived.  You wouldn't have to waive confidentiality

 9    because there weren't any communications.

10            MR. HARWIN:  That's correct.  It's the proposed

11    cross-examination that's of a concern.

12            THE COURT:  Okay.  All right.  Well, I'm not sure -- I

13    think --

14            BRANDON KOISTINEN:  If I could, I'd like to add

15    something.

16            THE COURT:  Yeah, let me ask Mr. Harwin what he thinks

17    about that.

18            MR. HARWIN:  Yeah, that's fine.

19            THE COURT:  Okay.  Go ahead, Brandon.

20            BRANDON KOISTINEN:  Okay.  I'd just like to say I

21    don't agree with what Mr. Loncar's saying.  He just said that

22    my testimony was to convict Jeffrey Koistinen during my state

23    trial when that's not the case.  In fact, because of me and

24    what I testified to, Jeffrey actually got two charges

25    dismissed, okay?  And that's why it's going to a retrial.
```

1      So, again, in my opinion, Mr. Loncar is actually lying and,

2  yeah, this is a good reason to lie.  Yeah, I don't think I

3  should waive any confidentiality when it comes to it.

4           THE COURT:  Okay.  Thank you.

5      Well, I guess that I'm going to have to do some homework

6  and see if we can find any case law or bar opinions that have

7  sanctioned this practice of having some counsel who had no

8  dealings with a former client, in this case Brandon, conducting

9  a cross-examination.  Again, I said I don't think that's

10  something I would want to do but I think we probably should see

11  if that's ever been done and what the courts or the state bar

12  has to say about that.

13      So, Mr. Loncar, you said you got a state bar opinion saying

14  that everything is okay because they weren't the same or

15  substantially related matters.  Did they opine on the conflict

16  that could result from the confidentiality and attorney-client

17  privilege?

18           MR. LONCAR:  So we discussed that.  I mean, I -- and

19  we just heard it again, he said I was lying.  I will happily

20  show you the transcript, show you my closing argument that

21  explained why his false statements are why the jury had to have

22  reasonable doubt.  So I just don't understand how this wrecking

23  ball is being allowed into this case and the government dragged

24  him in and it was their choice to do it.  Their goal was to get

25  rid of me and I'm fighting it because it's wrong.

UNITED STATES DISTRICT COURT

1        We have someone who literally doesn't know these things for

2   the time period in question, who hadn't spoken to Jeffrey in

3   years at this point, and the government's trying to squeeze him

4   in and, you know what?  I wouldn't be so surprised if I was

5   kicked off this case or withdrew and it proceeded to trial in

6   nine months or a year, I wouldn't be that surprised if they

7   ended up not even calling Brandon.

8        THE COURT:  I'm looking at the conflict of interest

9   waiver form.  So there's -- well, there's certainly provision

10  that either party can withdraw the waiver at any time, which to

11  the extent Brandon hasn't done that, he's done it now.  But

12  there's also a line in here:  If the clients' interests

13  diverge, the attorney subject to disqualification must withdraw

14  from representing the parties, both parties.

15      Isn't that where we're at?  Haven't their interests

16  diverged?

17      MR. LONCAR:  I think that's where we were at on the

18  state case.  This being not a related matter, and --

19      THE COURT:  Well, you're saying that Jeffrey (sic)

20  wants to convict your client.  So the interests diverge; he's

21  going testify to the government to help convict your client.

22  Isn't that the classic divergence of interests?

23      MR. LONCAR:  Well, I think that that conflict waiver

24  was applicable to that representation, which I agree with the

25  court, I mean, it's effectively been withdrawn from by Brandon.

```
 1    But I'd also point out, he accused me of photoshopping his
 2    signatures onto that, which is also false.  So, you know,
 3    again, we are just letting a Tasmanian devil of lies come in
 4    and wreck a case that should be conducted in an orderly
 5    fashion.  To have someone come in to testify that during the
 6    period they hadn't spoken to their father for years he used
 7    Skype or had his computer in his office or closed the door in
 8    his office, I mean, so he literally didn't see that one time
 9    during the applicable period here.
10         THE COURT:  Well, I don't know what to tell you.
11    Apparently, that's not going to be the testimony.  Based -- I
12    mean, I can't imagine that he's going testify that they were --
13    had no contact in six years 'cause otherwise Mr. Walters
14    wouldn't be calling him.  And you're saying it's false, it's
15    false, whatever, if you can prove it.  The question is how are
16    you going to do that?  It can't be based on confidential
17    information.
18         And I'm not sure this waiver just applies to that drug case
19    because, again:  If the clients' interests diverge, the
20    attorney subject to disqualification must withdraw from
21    representing the parties.  This may happen, for example, if the
22    state seeks to admit evidence that incriminates one defendant
23    but exculpates the other.  Okay?
24         And, again, this isn't directly exculpatory or
25    incriminating but to some extent it is.  It's -- Brandon's
```

1    testimony tends to, tends to incriminate Jeffrey in the sense

2    that those are his devices where I don't even -- I don't

3    remember but I'm just going to say where child porn was found,

4    okay?  And it certainly is like Jeffrey's (sic) going to

5    exculpate himself by saying:  They weren't my computers, they

6    were Dad's.

7        But the reason I'm saying this applies beyond this drug

8    case is because the reason this exists is because of, you know,

9    confidentiality concerns that result from joint representation.

10    That's why I think it lives on beside -- past the drug case.

11            MR. LONCAR:  So if Brandon has given sworn testimony

12    that he hadn't spoken to his father for six years until

13    Christmas of 2021 which is after any date alleged in the

14    indictment or in the report subsequently provided and

15    referenced to previously by Ms. Duryee, what are we even

16    talking about?  I guess they don't have a witness to this kind

17    of evidence from a relevant time period so they want to try to

18    do it from a different time period.

19            THE COURT:  Well, I don't know.  I mean, Mr. Walters,

20    are you saying Brandon's testimony, you know, is going to

21    encompass the time periods that are relevant in the indictment?

22            MR. WALTERS:  Your Honor, I think what -- I think what

23    Mr. Loncar is failing to appreciate about what Brandon is going

24    to testify about is it's not specifics.  He's not going to say

25    on these dates, he used this.  What he's going say are general

1    things, like he has -- like he knows from his time before, his

2    time after that he has used Skype for a long time.  Brandon did

3    live in that house at one period so he is able to talk about

4    how the defendant would go inside and lock the door, that no

5    one else used his computer, that his father, who he obviously

6    knows, whether he had a break from calling, from communication

7    for a while, he still knows that he is a cyber security

8    conscious guy, a techie guy.  All of that is relevant to

9    whether the defendant was using that specific computer at any

10   point and using Skype.

11       So even if we want to say like he can't talk about, you

12   know, who was using it -- he's not going to be able to say, you

13   know, he was using the device on that day.  He wasn't there, we

14   fully acknowledge that.  But what he can say again even if his

15   only testimony is:  I know that my father has been using Skype

16   for years and I also know that my father is a cyber security

17   conscious person and he is a very techie guy.  That alone makes

18   his testimony relevant to this case.  And so there are still

19   these issues.

20       I would also like to jump in, Your Honor, and say that

21   Mr. Loncar keeps saying that these cases are unrelated, the

22   state case and the federal case are unrelated.  Fine, but what

23   he wants to do is relate them now by bringing his former -- by

24   bringing Brandon's former testimony at the state trial to prove

25   that he is a perjurer at the federal trial.  He is the one that

1    is now choosing to bring these cases together.

2         And the fact that he, in order -- if he feels like he needs

3    to do that in order to effectively represent his client, then

4    he has to get off this case because there is a conflict of

5    interest when it comes to the prior representation of Brandon.

6         The final thing I'll say, Your Honor, is that the

7    superseding indictment -- I'm just bringing this up because I'm

8    up and Mr. Loncar brought it up -- we do still intend to

9    supersede.  We are just kind of waiting to see how all this

10   stuff shakes out before we do that.  But we've been providing

11   reports to the defense in anticipation of that happening at

12   some point in the future, like I said, once we are clear of all

13   of this conflict issue.

14             THE COURT:  Okay.  Well, I think Mr. Walters does make

15   a good point in that you are trying to make the matters

16   substantially related if you are going to try to get into

17   perjury during the state court trial.  And I understand that

18   you think the remedy could be a third, you know, just another

19   attorney doing the cross-examination but I have to tell you,

20   that's -- I still -- I'm not sure we're in -- at the end of the

21   day, if your concern is Brandon, you know, filing a bar

22   complaint or making an accusation against you, I just feel like

23   this other attorney's just going to be a conduit to get to you,

24   you know.

25        And I'm not, I'm not saying who's right or wrong or, you

1    know, if the allegations are true or not, I'm just saying I

2    just can see the same thing happening because that attorney is

3    going to have to meet with you and talk about this case because

4    you know it so well.  And there's just never going to be any

5    real assurance I suspect in Brandon's mind, you know, that

6    there's certainly distrust there, right?  He doesn't trust you

7    and I guess you don't trust him, so is he going to trust that

8    this other attorney didn't have -- that you didn't have

9    conversations with that attorney?  Probably not.  Probably not.

10        That's why I just, I think this, having this other attorney

11   -- besides concerns about ineffectiveness, because if he didn't

12   have any -- if the attorney, if he or she didn't have any

13   conversations with you, well, that's a problem.  That attorney

14   can't do cross-examination in a vacuum.

15        But that said, let's, let's try to get some, see if we can

16   get any guidance from a court or the state bar about having

17   some, you know, some lawyer come in to do the cross-examination

18   before I make a decision.  I know you've been waiting for a

19   decision and I know we have motions to suppress pending, and if

20   you're going to supersede, I mean, at this point, do what

21   you're going to do, don't wait for me because this is a, it's a

22   tough issue because I'm very cognizant of Mr. Jeffrey

23   Koistinen's right to have counsel of his choosing.  But it is

24   incredibly complicated given the joint representation and the

25   state court testimony that you're bringing up, and this

1  conflict of interest waiver form has some language that frankly

2  cuts both ways.

3      And when I say this cuts both ways, it's this language in

4  it which says:  Joint representation reduces the protection

5  available under the attorney-client privilege as there's no

6  attorney-client privilege between jointly represented clients

7  during the pendency of the matter.  Additionally, joint

8  representation also compromises confidentiality due to the

9  attorney's duty to inform all co-clients of information

10  relevant to the representation.

11      Well, I guess that actually really doesn't cut -- I started

12  thinking that even if Brandon told you something, you would be

13  duty bound to share that with Jeffrey but that doesn't

14  necessarily mean -- confidentiality, confidentiality is not

15  waived by the disclosure between one client and another, so

16  never mind on that point, so just thinking it through.

17      All right.  So, all right.  Well, let's -- when do you guys

18  want to meet again and how long should we set this out to do

19  some research?

20          MR. WALTERS:  To do research -- just to clarify,

21  research on the issue of whether another lawyer can conduct the

22  cross-examination?

23          THE COURT:  Yeah.  A couple of weeks?

24          MR. WALTERS:  I was going to say -- I would prefer,

25  Your Honor, at least three weeks, just to make sure that we can

1    -- I am not aware and I'm not aware of any Ninth Circuit case

2    law that relates to this issue.  So I think we're going to have

3    to do a pretty extensive search nationwide to determine if any

4    court, state or federal, has done that and I think that's a

5    pretty big, that's a pretty big undertaking for Mr. Loncar and

6    myself, which is fine, I'm happy to do it, but I would just, I

7    would request a little more, at least three weeks, if not

8    longer.

9            THE COURT:  Okay.  That's fine.  We can get a date

10   about three weeks out.

11           CLERK:  August 25th, Judge.  Do you want morning or

12   afternoon?

13           THE COURT:  Whatever is better for these attorneys.

14           MR. LONCAR:  Your Honor, I start a murder trial in

15   Phoenix on August 7th.

16           THE COURT:  Is that a long, multi-week?

17           MR. LONCAR:  Yes, probably through the entire month of

18   August, but they are off on Fridays.

19           THE COURT:  Okay.  That's fine.  I don't have court

20   time but I think we can get court time on a Friday.

21           MR. WALTERS:  Well, and, Your Honor, if -- this is

22   obviously Mr. Loncar's decision but if we want to bump it out

23   longer because I don't -- it seems unfair to him, knowing that

24   he starts a murder trial in about, I guess, a week or so to ask

25   him to also do a bunch of research on this issue while he's

```
 1   doing a multi-week murder trial.  Obviously, I'll defer to him.

 2   I mean, he can manage his caseload and knows what his abilities

 3   are certainly more than I do.  But if we want to bump it out

 4   longer to give him time to really look into this issue once

 5   he's out of trial, we have no objection to that either.

 6           MR. LONCAR:  I can do it in less time.  I was, in

 7   fact, thinking three weeks is a little long.

 8           THE COURT:  All right.  So you want to set it on a

 9   Friday about three weeks out?  Which today is what, the 29th?

10           CLERK:  So first week in September, Judge?

11           THE COURT:  No, let's see.  Today's the 29th so that's

12   one, two, three.  What about Friday, August 22nd?  That's like

13   three weeks and some change and I know if Karen's listening,

14   we'll have to get marshal time but I'm pretty confident on a

15   Friday we'll be able to do it.

16           CLERK:  Yes, Karen is providing on the 22nd, Judge.

17           THE COURT:  What time do you guys want?

18           MR. LONCAR:  Morning?

19           THE COURT:  Morning, 9:00 o'clock?

20           MR. WALTERS:  That's fine.

21           THE COURT:  Okay.  August 22nd at 9:00.

22           MR. HARWIN:  I've got a conflict with that time,

23   Judge.  Can we do it a little later in the morning?

24           THE COURT:  Sure, 10:00?

25           MR. HARWIN:  How about 11:00?
```

1          THE COURT:  11:00, yeah, that's fine.

2          CLERK:  Okay, Judge.

3          THE COURT:  11:00 o'clock, August 22nd.

4      Now that said, if you guys find some authority -- well, if

5   you actually find anything, you can just submit a short

6   pleading even if it's -- if you're pressed for time even if

7   it's the day before and, conversely, if I find something, I'll

8   get in touch with you guys as well.

9          MR. WALTERS:  Just to be clear, Your Honor, you're

10  not -- you don't want any formal briefing on this issue, you

11  just want to know if we find any controlling precedent?

12         THE COURT:  Yeah.  You can just file a short pleading,

13  you know, just saying, you know, see such and such case --

14         MR. WALTERS:  Sure.

15         THE COURT:  -- parentheses, you know, what it was

16  about.

17     So, okay.  All right.  Mr. Harwin, I think can we have

18  Brandon hang up?  Are we done from your perspective?

19         MR. HARWIN:  Yes, Your Honor.

20         THE COURT:  Okay.  Brandon, you're free to hang up.

21         BRANDON KOISTINEN:  Thank you, Your Honor.

22         THE COURT:  Okay.  All right.  So in terms of the

23  motion for reconsideration in terms of the detention issue,

24  pretrial did do a supplemental report, they're still

25  recommending detention.  I know that, Mr. Walters, you filed a

1     thorough response.

2         Let me ask you, so this $750,000 bond in state court, what,

3     I assume that wasn't 750,000 cash.  Is that like 10 percent?

4     What do you have to do in state court?

5             MR. LONCAR:  It was $750,000 cash bail and it was

6     returned once Mr. Koistinen was arrested for the federal

7     charge.

8             THE COURT:  Okay.

9             MR. LONCAR:  So he posted $750,000 cash bail in state

10    court and a week later was arrested right by his house in his

11    car with his wife, no luggage or anything.  So, I mean, if he

12    was ever going to flee, that was the time.  So that's the

13    argument.

14            THE COURT:  Okay.  And is that money still available

15    that he posted?

16            MR. HARWIN:  Can I be excused?

17            THE COURT:  Yes, sir.  Thank you.  Appreciate it.

18            MR. LONCAR:  Yes.

19            THE COURT:  And who has the passport?

20            MR. LONCAR:  Either HSI or the government.  I mean,

21    Tucson Police Department might even.

22            THE COURT:  Okay.

23            MR. LONCAR:  I'm not sure.

24            THE COURT:  Nevertheless, the question is he doesn't

25    have the passport, it's not at his house or anything?

1          MR. LONCAR:  It's not.

2          THE COURT:  Okay.  Okay.  Well, because of the nature

3    of the charge or charges, electronic monitoring and home

4    detention would be required, and I don't think pretrial has

5    looked into that yet.  So I haven't really decided what I'm

6    going to do but I need, I'm going to ask pretrial to look into

7    how the electronic monitoring equipment works at his place of

8    residence, and maybe they did do that, I can't remember.  Let

9    me look.

10          PRETRIAL:  Judge, we have not.

11          THE COURT:  You have not, okay, okay.  So I'm going to

12    ask pretrial to look into that and obviously the residence has

13    to be free of -- certain distances from where minors would be

14    present so I'll ask pretrial to do that.

15       Mr. Walters, I -- is your position that no amount of money

16    and no other conditions would be suitable to the government?

17    If there's a monetary condition, if you think it's more than

18    750, speak now or forever hold your peace.

19          MR. WALTERS:  No, Your Honor.  The first part of your

20    question is the government's position.

21          THE COURT:  Okay.  All right.  So I'm going to think,

22    I'm going to see what pretrial says about the electronic

23    monitoring condition and home detention, and I just need to

24    think about it a little more as well once pretrial comes back

25    on that.  So I'll try and make a decision as soon as possible

1    after I get that information from pretrial.  Okay?

2              CLERK:  Are we setting another date for the motion to

3    reconsider?

4              THE COURT:  No, I will -- I'll set a date, I'll set a

5    hearing if we need one on that.

6              CLERK:  Okay, Judge.

7              THE COURT:  Okay.  All right.  Thank you.

8              MR. LONCAR:  Since I didn't really know, Your Honor,

9    whether the court was considering the motion to reopen today as

10   whether to reopen the detention hearing or whether to kind of

11   treat it as a detention hearing, I did bring and I have

12   supplied to counsel some character letters on Mr. Koistinen's

13   behalf.  I can -- I have hard copies here or I can provide

14   them --

15             THE COURT:  I can take hard copies.  If Mr. Walters

16   has copies, that's fine.  Unless you want to have them in the

17   docket, then you can just file them.

18             MR. LONCAR:  I think I don't want to just 'cause of

19   the identities of the people.

20             THE COURT:  Yeah, that's fine.  You can just give me

21   hard copies if Mr. Walters has them, then I'll take a look at

22   those.

23             CLERK:  Thank you.

24             THE COURT:  And you guys thoroughly briefed it and,

25   you know, again, I -- I mean, actually, it was probably one of

1   the few thoroughly briefed detention arguments and oppositions

2   that I come across because it's usually just oral argument on

3   that stuff.  So if I think there's oral argument needed, I'll

4   certainly set it but let's see what pretrial has to say.

5       I was just looking at the original conditions and

6   Mr. Koistinen was detained as a risk of nonappearance.  So you

7   did not request or put on any evidence as to dangerousness; is

8   that right, Mr. Walters?

9           MR. WALTERS:  Your Honor, that was before I was on the

10  case officially, I think.  I note Ms. Duryee was handling this

11  case initially by herself.  But I don't believe that that was

12  the case.

13          THE COURT:  Okay.  All right.  Great.  Okay.  All

14  right.  We'll stand at recess and hopefully make some progress.

15  Okay.  Thank you.

16      (The matter was concluded at 4:17 p.m.)

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4          I, Cindy J. Shearman, court-approved transcriber,

5   certify that the foregoing is a correct transcript from the

6   official digital sound recording of the proceedings in the

7   above-entitled matter to the best of my ability.

8

9

10    s/Cindy J. Shearman_____        August 4, 2025_
     Cindy J. Shearman, RDR, CRR, CRC        Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT