**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | **No. CR-23-01495-TUC-AMM (EJM)** |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Jeffrey Allen Koistinen, | |
| Defendant. | |

Pending before the Court are the defendant's Motion to Suppress Electronics and Motion to Suppress Blue iPhone.  (Docs. 33 & 34.)  On April 18, 2026, the government filed its responses.  (Docs. 44 & 45.)  Subsequently, defendant replied.  (Docs. 51 & 52.)

Pursuant to LRCrim 5.1, this matter came before the undersigned for an evidentiary hearing and a report and recommendation.  The Court held an evidentiary hearing on the instant motions on February 23, 2026 and March 5, 2026.[1]  (Docs. 100 & 106.)  The motions are fully briefed and the Court has received the hearing transcripts.  As such, the motions are ripe for adjudication.  For the reasons discussed below, it is recommended that the District Court deny both motions.

. . .

. . .

. . .

_____

[1] The evidentiary hearing was continued multiple times for the following reasons: (1) resolving whether defense counsel has a nonwaivable conflict of interest preventing him from representing the defendant; (2) the parties were negotiating a plea agreement that would have made the motions moot; and (3) witness unavailability.

## I.   PROCEDURAL BACKGROUND

### A.   *The Pending Charges*

The defendant is charged in an eleven (11) count Indictment dated September 27, 2023, with the following offenses: (1) Attempted Productions of Child Pornography, in violation of 18 U.S.C. §§ 2251(a) & 2251(e) (Counts 1, 3, 5, 7, and 9); (2) Attempted Coercion and Enticement, in violation of 18 U.S.C. § 2422(b) (Counts 2, 4, 6, 8, and 10): and (3) Receipt of Child Pornography, in violation of 18 U.S.C. §§ 2252(a)(2) & (b)(1) (Count 11).  (Doc. 13.)

### B.   *The Motions to Suppress*

On March 6, 2025, the defendant filed the instant motions.  The blue iPhone and other electronic devices were seized and searched pursuant to state search warrants targeted at an illegal marijuana grow operation.  After suspected images of child pornography were found during the search of the blue iPhone, law enforcement obtained another state search warrant to search the iPhone and the other electronic devices for evidence of child pornography.  The defendant does not challenge the lawfulness of that search warrant. Rather, the Motion to Suppress Electronics seeks the suppression of evidence extracted from seized electronic devices because (1) there was not probable cause that evidence of the illegal marijuana grow operation would be contained on the electronic devices; (2) the search warrant was overbroad allowing officers to seize all electronic devices regardless of whether they contained evidence of the grow operation; and (3) the search warrant did not particularly describe the electronic devices to be seized or limit the search of the devices. (*See* Doc. 34.)  The Motion to Suppress Blue iPhone seeks the suppression of evidence extracted from the phone because the government has no evidence of where and when the phone was found or who found it.  (*See* Doc. 33.)

The government argues that there was probable cause for the search warrant and addendums for the defendant's residence and vehicles because the search warrant affidavits established that the defendant and his children were engaged in an illegal marijuana grow operation.  Specifically, the affidavit details that (1) the defendant's daughter told law

enforcement officers that it was her father's idea to conduct the grow operation; (2) he recently got upset because she did not want to help with the grow operation; and (3) the defendant owns the residences where the grow operations were being conducted. (*See* Doc. 46.) Additionally, the affidavit sets forth why financial records pertaining to such a grow operation were likely to be found in a suspect's residence and vehicles, as well as why these documents would likely be stored on electronic devices. (*Id*.) With respect to the inability to pinpoint when and where the blue iPhone was found by law enforcement while executing the search warrants, the government argues that the defendant's Motion to Suppress blue iPhone "does not provide a basis for suppression and instead at best raises a factual dispute which goes to the weight rather than the admissibility of the evidence and which should be resolved by the jury." (*See* Doc. 45.)

## II.    FACTUAL BACKGROUND

At the evidentiary hearing, the government called three witnesses: Detective Fernando Robles, TPD Officer Brandon Angulo, and Detective Michael Szelewski. The defense called two witnesses: Marana Police Officer William Dittiger and TPD Officer Phillip Hengstler.

### A. *The Golden Mirror and Fallen Shadow Search Warrants*

In April 2022, Marana Police Department officers received an anonymous complaint about drugs being manufactured at a residence located at 12565 North Golden Mirror Drive (the "Golden Mirror house"). (Def. Ex. 22 at 3.) In July 2022, officers observed a Tesla vehicle registered to Brooke Koistenen leaving that house and followed the vehicle to a house located at 12379 North Fallen Shadow (the "Fallen Shadow house"). (*Id*.)

On August 16, 2022, Marana Police Officers were conducting a surveillance operation of the Golden Mirror house. (Hr'g Tr. 2/23/2026 at 8; Def. Ex. 22 at 3.) Officers observed a Tesla and Mercedes arrive at the house. (Def. Ex. 22 at 3.) The drivers of the vehicles and a passenger went into the house for a short period of time. (*Id.*) When they

left the house, a traffic stop was performed on the Tesla. (*Id*.) The driver and registered owner was the defendant. (*Id*.) The defendant told "police that if he gave information on the activity at the residence on Golden Mirror, his daughter Brooke Koistenen and her husband would get in trouble." (*Id*.)

TPD officers obtained a search warrant for the Golden Mirror house which they knew was owned by the defendant. (Hr'g Tr. 2/23/2026 at 11; Def. Ex. 22 at 3.) The search warrant authorized a search of the residence for marijuana, drug paraphernalia, indicia of occupancy or ownership of the residence, and documents related to the grow operation. (Hr'g Tr. 2/23/2026 at 12.) During the search of the Golden Mirror house, officers found "marijuana plants in various stages of cultivation that exceeded the statutory allowance of 12 plants," a sophisticated "multi-room marijuana grow operation," "some evidence of processing of marijuana," and sophisticated equipment used for the marijuana grow operation. (Hr'g Tr. 2/23/2026 at 14, 18–19; Def. Ex. 22 at 3.) It appeared that no one was living at Golden Mirror house and there was no evidence that it was being rented. (*Id*. at 14, 35.)

TPD officers subsequently obtained information that the defendant's daughter and son were living at the Fallen Shadow house, which was also owned by the defendant, and that additional items of evidence may be located at that residence. (*Id*. at 14.) Based on that information and the evidence found at the Golden Mirror house, a search warrant was obtained for the Fallen Shadow residence. (*Id*. at 15.)[2]

Brooke Koistenen was present at the Fallen Shadow house when officers arrived to conduct the search. (Def. Ex. 22 at 3.) She told police that she was helping her dad "with a marijuana grow by cleaning, filling propane and doing things for him." (*Id*.) Brooke also said that "her dad became upset two weeks ago because she did not wish to help him with the marijuana grow." (*Id*.) She identified "her brother Brandon [a]s the mastermind,

---

[2] Officers did not "check for any licensing" that allowed the marijuana grow operations at the Golden Mirror or Fallen Shadows houses. (Hr'g Tr. 2/23/2026 at 34–35.) The defendant, however, does not challenge the search warrants issued for those houses.

but it was her dad's idea to grow marijuana." (*Id*.)  During the search at Fallen Shadow officers found financial receipts and documents related to the grow operation, including documents related to the purchase of grow equipment. (Hr'g Tr. 2/23/2026 at 19, 40.)  The documents did not reference the defendant or his home address. (*Id.* at 40–41.)

### B. *The Butterfly Mountain Search Warrant*

Based on Brooke Koistenen's statements and the evidence seized from the Golden Mirror and Fallen Shadow houses, on August 17, 2022, Tucson Police Detective Michael Szelewski presented a Marana Municipal Court Judge with a telephonic search warrant affidavit requesting a search warrant for the defendant's home located at 4495 West Butterfly Mountain Drive (the "Butterfly Mountain house"), as well as a motor home located on the property and the defendant's person.[3]  (Def. Ex. 22 at 1.)  Detective Szelewski told the judge that (1) prior to the execution of the Golden Mirror and Fallen Shadow search warrants, the defendant conveyed to officers that he if told them about the activity going on at the Golden Mirror residence his daughter and her husband would get in trouble; (2) during the searches of the Golden Mirror and Fallen Shadow residences, officers found "marijuana plants in various stages of cultivation that exceeded the statutory allowance of 12 plants"; (3) the defendant's daughter was present at the Fallen Shadow residence and told officers that she was helping her dad with the marijuana grow, he got upset when she told him that she wanted to stop, and it was her dad's idea to grow marijuana; (4) the defendant's home address is 4495 West Butterfly Mountain Drive and a parcel search of the Golden Mirror and Fallen Shadow houses show the property owner associated with the Butterfly Mountain house; and (5) "DES records show no reportable income for Jeffery Koistenen, but he is the owner of GM Holding Company, LCC[,]" which lists its address as 4495 West Butterfly Mountain Drive." (*Id*. at 3–4.)

---

[3] Detective Szelewski went to the same judge that issued the Golden Mirror and Fallen Shadows search warrants because that judge "was already familiar with the situation and the ongoing investigation." (Hr'g Tr. 3/5/2026 at 6.)  Detective Szelewski described the investigation as "complicated" and observed that it had been going on for months and involved multiple residences and individuals. (*Id*.)

Detective Szelewski requested permission to search the Butterfly Mountain house for evidence related to the marijuana grow operation, including records related to the grow operation. (*Id*. at 1–2, 4.)  He further requested to search the contents of computers and cell phones for these records.  (*Id*.)  Detective Szelewski explained that "drug dealers and money launderers utilize these devices to keep track of their negotiations, they take photographs and videos of their product and proceeds, as well as utilize the internet and social media accounts to advertise and promote their illegal enterprise."  (*Id*. at 4.)[4]

The Marana Municipal Court Judge issued a telephonic search warrant authorizing law enforcement officers to search the house, motor home, and defendant's person for evidence related to the illegal marijuana grow operation and money laundering, as well as to search the contents of electronic devices (*e.g*., computers and cell phones) found at those locations.  (Def. Ex. 22 at 4–5; Def. Ex. 23.)  The search warrant's authorization to search electronic devices did not "provide for any limitation as to a time frame" and it was similarly without limitation regarding "communications between specific parties" or "specific transaction[s]."  (Hr'g Tr. 3/5/2026 at 19.)

Prior to executing the Butterfly Mountain search warrant, law enforcement officers did not know exactly what electronic devices the defendant owned.  (*Id*. at 25.)  If officers had "known specifically what electronic devices the defendant owned," those devices would have been identified in the search warrant affidavit.  (*Id*.)  Ultimately, officers seized numerous computers and electronic storage devices from the Butterfly Mountain house.  (Hr'g Tr. 2/23/2026 at 32; Def. Exs. 16 & 25.)  The blue iPhone was not one of the devices seized from the defendant's Butterfly Mountain residence.  (Hr'g Tr. 2/23/2026 at 23; Def. Ex. 23.)

. . .

---

[4] At the time that Detective Szelewski applied for the Butterfly Mountain search warrant, law enforcement did not have evidence that the defendant received proceeds from marijuana sales, that he made any purchases of grow equipment, or that he used a phone or any other electronic device in connection with the grow operation.  (Hr'g Tr. 2/23/2026 at 38.)  For the reasons discussed, *infra*, and notwithstanding the absence of this evidence, there was probable cause for the Butterfly Mountain search warrant.

- 6 -

### C. *The traffic stop of the defendant and the search of his person*

On August 17, 2022, at approximately 6:20 p.m., TPD Officer Phillip Hengsteler performed a traffic stop of the defendant's white Tesla. (Hr'g Tr. 2/23/2026 at 19–20, 27, 98–99).  The defendant was driving and his wife was in the front passenger seat. (*Id*. at 19, 27, 99.)  Officer Hengsteler had the defendant step out of and away from the vehicle; however, he did not place the defendant under arrest at that time.  (Def. Ex. 11 at 00:42; Hr'g Tr. 2/23/2026 at 99.)

For officer safety reasons, he asked the defendant's wife to give him her purse and phone; he told her that he was not going to search her purse. (Def. Ex. 11 at 10:40; Hr'g Tr. 2/23/2026 at 103.)  The defendant's wife gave Officer Hengsteler her purse and a cell phone with a red case.  (Def. Ex. 11 at 11:10; Hr'g Tr. 2/23/2026 at 103.)[5]  Officer Hengsteler also asked the defendant's wife where the defendant's phone was located.  (Def. Ex. 11 at 11:20; Def. Ex. 13 at 3; Hr'g Tr. 2/23/2026 at 105.)  She looked around the inside of the vehicle and said, "I don't know."  (Def. Ex. 11 at 11:20; Def. Ex. 13 at 3; Hr'g Tr. 2/23/2026 at 105.)

Marana Police Officer Duarte, who arrived on scene at about 6:30 p.m., handcuffed the defendant, searched him, and placed him in the back of his patrol vehicle.  (Def. Ex. 12 at 3:25, 5:40, 6:40; Hr'g Tr. 2/23/2026 at 99.)[6]  Officer Durate's body camera footage shows him searching the defendant, removing a wallet and loose cash and coins from the

---

[5] Body camera footage shows Officer Hengsteler placing the wife's purse and phone on the front windshield/hood area of the defendant's car.  (Ex. 11 at11:50; Ex. 12 at 9:00.)  Officer Hengsteler does not recall if he returned the purse to the defendant's wife.  (Hr'g Tr. 2/23/2026 at 103.)  Body camera footage, however, shows Officer Hengsteler picking up the purse and phone from the front windshield/hood area of the defendant's car and handing them to the defendant's wife through the front passenger window.  (Def. Ex. 11 at 29:00)

[6] The transcript of the audio from the body camera footage reflects Officer Hengsteler later advised other officers that the defendant was under arrest, but his wife was not.  (Def. Ex. 13 at 3.)  It also reflects that he said that "they need to get an addendum to the warrant to search that."  (*Id*.)  Officer Hengsteler's best recollection is that another officer at the scene told him that a search warrant addendum was needed.  (Hr'g Tr. 2/23/2026 at 111.)  Presumably Officer Hengsteler was referring to an addendum to search the vehicle, but no testimony was elicited to clarify that point.

defendant's pockets, and placing those items in an evidence bag. (Def. Ex. 12 at 3:25.)[7] Officer Hengsteler does not recall whether Officer Duarte provided him with those items; however, he agreed that the body camera footage shows only a wallet and loose cash in an evidence bag. (Def. Ex. 11 at 12:30; Def. Ex. 12 at 5:40, 6:40; Hr'g Tr. 2/23/2026 at 103–04.)

When the defendant was in the back of the patrol vehicle, Officer Hengsteler asked him "where his phone was" and the defendant responded, "either in the car or 'she has it[.]'" (Hr'g Tr. 2/23/2026 at 104.) The defendant did not tell officers that an "officer took it from" him. (Id. at 106.) Officer Hengsteler did not read the defendant his Miranda rights before asking about the phone. (Id. at 109.) Officer Hengsteler does not recall finding or taking custody of a cell phone; if he had done either, it would be documented in his report, and his report does not mention a cell phone. (Id. at 100–01.)

Marana Police Sergeant Dittiger responded to Officer Hengsteler's traffic stop of the defendant's Tesla. (Id. at 87, 91.)[8] When he arrived, the defendant was in the back seat of a law enforcement vehicle. (Id.) Sergeant Dittiger did not take part in searching the defendant's person or bagging the evidence collected. (Id. at 91.) He also did not search the defendant's wife or her purse and does not recall being involved the search of the Tesla. (Id. at 92, 95.)

---

[7] Officer Duarte was not a witness. His body camera footage was admitted into evidence without objection, but it was not played in court. The Court notes the following based on its review of the one-hour and twenty-two minutes of footage. Officer Duarte is heard confirming with the defendant that he did not have any other items on his person. (Ex. 12 at 12:44.) Additionally, at approximately minute eleven, the video shows the rear hatch of the defendant's vehicle open and then officers close it. (Def. Ex. 12 at 11:15.) Finally, the body camera footage makes clear that the Butterfly Mountain house had not been searched by the time of the traffic stop because officers ask the defendant if he had his house keys and whether he has dogs at the house. (Def. Ex. 12 at 10:00.) Subsequently at 7:12 p.m. (assuming the time is accurate on the camera footage), Officer Duarte asks the defendant to explain how to open the gate where the box trailer is located on the property; Officer Duarte can then be heard on his phone relaying that information to officers who are presumably at the Butterfly Mountain house. (Def. Ex. 12 at 42:45.)

[8] At the time of the stop, Sergeant Dittiger was a supervisor in the asset forfeiture department of the Counter Narcotics Alliance. (Hr'g Tr. 2/23/2026 at 86.) He and several other officers were assigned to assist with the execution of the various search warrants. (Id.)

Sergeant Dittiger does not recall if he recovered a blue iPhone at the scene of the traffic stop and he "did not write a supplement" affirming whether or not he had found a blue iPhone. (*Id*. at 87–88.) Sergent Dittiger's supplemental report notes that he does not "remember taking custody of Jeffery Koistenen's cell phone[.]" (Def. Ex. 18; Hr'g Tr. 2/23/2026 at 89.) Sergeant Dittiger also does not remember "observ[ing] anybody else find a blue iPhone[.]" (Hr'g Tr. 2/23/2026 at 88.) Sergeant Dittiger agreed that it is possible he found the blue iPhone even though it is not documented in the chain of custody forms. (*Id*. at 93–94.) He also testified that even if he did not find the phone, it is also possible that he took custody of the phone from another officer at the scene of the traffic stop, later provided the phone to TPD Officer Brandon Angulo (who was tasked with making a record of the seized evidence), and told Officer Angulo where the phone was found. (*Id*. at 94–96.)

Sergeant Dittiger clearly recalls driving the defendant's Tesla from the scene of the traffic stop to the Butterfly Mountain residence. (Def. Ex. 18; Hr'g Tr. 2/23/2026 at 92.) Officer Hengsteler left the scene at the same time. (Def. Ex. 14.) Neither officer testified about what time they left the scene. At around 7:53 p.m., which is when Officer Duarte's body camera footage ends, the defendant's vehicle is still at the scene of the traffic stop. (Def. Ex. 12 at 1:22:44.)

### D. *The Butterfly Mountain Search Warrant Addendum*

At 7:54 p.m., Detective Szelewski submitted a telephonic affidavit requesting an addendum to the Butterfly Mountain search warrant authorizing the search a white Tesla with an Arizona license plate. (Gov. Ex. 1 at 2.) Detective Szelewski told the Marana Municipal Court Judge that officers wanted to search the vehicle because the defendant was seen leaving the Butterfly Mountain house in the vehicle and officers were continuing to investigate the unlawful cultivation of marijuana and money laundering.[9] (*Id*. at 2–3.) As a result, officers requested permission to search the vehicle, seize electronic devices

---

[9] Detective Szelewski contacted the same Judge who had issued the original Butterfly Mountain search warrant. (*See* Gov. Ex. 1.)

found in the vehicle, and search the devices for records and documents related to those crimes.[10] (*Id*. at 3.)  At 7:56 p.m., the judge issued an addendum to the Butterfly Mountain search warrant which authorized officers to search the Tesla, as well as seize and search electronic devices found in the vehicle. (Gov. Ex. 1 at 3; Hr'g Tr. 3/5/2026 at 27–28.) [11]

### E. *The Evidence Log's entry for the seizure of the Blue iPhone*

TPD Officer Angulo was assigned to be the recorder for the various search warrants, which means as officers locate evidence during their search "it's brought to [him] for recording purposes." (Hr'g Tr. 2/23/2026 at 68.)  He performed that duty at the Butterly Mountain residence. (*Id*.)

Officer Angulo's report notes that the blue iPhone was seized from the defendant's person.[12]  (Def. Ex. 16.)  Neither his report nor the property log notes which law enforcement officer brought him the blue iPhone; however, that is standard practice

---

[10] When seeking the addendum, Detective Szelewski relied on the same information contained in the probable cause affidavit for the Butterfly Mountain search warrant. (Hr'g Tr. 3/5/2026 at 8.)  The only addition to his affidavit for the addendum was that the Tesla "showed up, that it left, and that [he] needed to search the vehicle because it could have housed or concealed the items" that officers were searching for in the Butterfly Mountain residence. (*Id*. at 10.)

[11] Detective Szelewski also applied for and obtained addendums to search two other vehicles which are only relevant to the instant motions in the following respect.  The first addendum was for a white Tesla with a California license plate.  The Butterfly Mountain search warrant notes that this addendum was issued at 6:23 pm. (Def. Ex. 23.)  The second addendum was for the defendant's while Tesla with an Arizona license plate. (*Id*.)  Although the search warrant does not note the time this addendum was issued, the transcript of the telephonic affidavit reflects that Detective Szelewski applied for the second addendum at 7:54 p.m., and it was issued at 7:56 p.m. (Gov. Ex. 1 at 3.)  The third addendum was for a white BMW with a California license plate. (Def. Ex. 23.)  The search warrant notes that this addendum was issued at 9:16 p.m. (*Id*.)  Detective Szelewski testified that he forgot to note the time the second addendum was issued. (Hr'g Tr. 3/5/2026 at 31.)

[12] Officer Angulo's initial report mistakenly noted that the blue iPhone was associated with the white BMW. (Hr'g Tr. 2/23/2026 at 72.)  That mistake resulted from the fact that this was "a very fast-moving investigation" and several officers were bringing Officer Angulo "lots of pieces of evidence[.]" (*Id*. at 73.)  Officer Angulo realized his mistake about the vehicles after speaking with other officers who were present for the searches. (*Id*. at 77–78.)  Officer Hengstelar, who was present at both traffic stops, advised Officer Robles that Jeffrey Koistinen was driving the white Tesla and Brandon Koistinen was driving the white BMW. (*Id*. at 78–79.)  Once Officer Angulo realized his mistake, he prepared a supplemental report to reflect that Jeffery Koistinen was driving the white Tesla. (*Id*. at 74.)

because there were multiple officers providing him with many items of evidence.  (Hr'g Tr. 2/23/2026 at 26, 80–81.)  Officer Angulo has known Sergeant Dittiger for over a decade, and they worked in the same building for years.  (*Id*. at 82.)  As a result, Officer Angulo is "[o]ne hundred percent" certain that Sergeant Dittiger provided him with the blue iPhone and said that the phone belonged to Jeffrey Koistinen and that it was "located on his person."  (*Id*. at 69–70, 82)

Based on Detective Robles's review of the evidence related to the investigation (*i.e*., law enforcement reports, evidence collection logs, and body camera footage), he believes the iPhone was not seized from the defendant's person.  (*Id*. at 25.)  Detective Robles believes that the blue iPhone was found either in the defendant's white Tesla or his wife's purse "[s]ometime between the traffic stop and when the Tesla got back to Butterfly Mountain."  (*Id*. at 33, 45.)  But regardless of whether the blue iPhone was located in the Butterfly Mountain residence, the defendant's white Tesla, or the defendant's person, all of these "locations were covered by the Butterfly Mountain warrant and the addendum[.]" (*Id*. at 28, 31, 33.)  Detective Robles has no "reason to believe that the seizure of the blue iPhone fell outside the scope of the [search] warrants[.]"  (*Id*. at 31.)

### F.  *Search of the blue iPhone*

About a week after the various search warrants were executed, Detective Robles searched the blue iPhone for evidence relating to the marijuana grow operation.  (Hr'g Tr. 2/23/2026 at 28–29, 47.)  Detective Robles reviewed the information extracted from the phone on his computer.  (*Id*. at 47.)  He usually looks "at images and videos first because they're much easier to consume than documents and other things like that."  (*Id*. at 51.)  As Detective Robles was looking through the phone, he saw some images and videos that were "potential child pornography[.]"  (*Id*. at 29–30.)  Detective Robles cannot specifically recall which file in the phone contained the suspected child pornography; he either saw it in the images or videos.  (*Id*. at 50–51.)[13]  When he saw the suspected child pornography,

---

[13] Detective Robles does not recall if he saw adult pornography before he saw the suspected child pornography.  (Hr'g Tr. 2/23/2026 at 53.)  The presence of adult pornography on the blue

Detective Robles stopped his search and obtained a search warrant from a Pima County Superior Court Judge to search the phone and the other seized electronic devices for evidence related to child pornography.  (Def. Ex. 25; Hr'g Tr. 2/23/2026 at 30.)

## III.   DISCUSSION

> ### A. *There was probable cause for the Butterfly Mountain search warrant and addendum issued for the search of the residence and the defendant's person and vehicle, as well as for the search of the electronic devices found in those locations*

The Fourth Amendment requires that a search warrant be supported by probable cause.  The Supreme Court has held that probable cause exists when there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  That Court has also held that "only the probability, and not a prima facie showing, of criminal activity is the standard for probable cause." *Gates,* 462 U.S. at 235 (quotations and citations omitted).

The search warrant affidavit must establish a "reasonable nexus" between the alleged criminal activity and the place to be searched. *United States v. Pitts*, 6 F.3d 1366, 1369 (9th Cir. 1993) (citations omitted).  A judge presented with a search warrant "is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense." *United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986) (citations omitted).  When evaluating whether a search warrant is supported by probable cause, a court can only consider the facts contained within the four corners of the search warrant affidavit. *Whiteley v. Warden*, 401 U.S. 560, 565 n.8 (1971).  The duty of the court reviewing whether a search warrant is supported by probable

---

iPhone would not have prevented him "looking at the rest of the pictures to see if there's indicia of a marijuana grow operation[.]" (*Id.* at 63.)  During the twenty years Detective Robles has reviewed information extracted from cell phones, he has "seen an immense amount of pornography" because "it almost goes hand in glove with narcotics and with people in general." (*Id.* at 53.)  As a result, finding adult pornography on a phone does not make him believe that he is going to find anything other than the evidence that he is searching for. (*Id.*)  In fact, this was the first time he had ever seen images that looked like child pornography. (*Id.*)

cause "is simply to ensure that the [issuing judge] had a substantial basis for concluding that probable cause existed." *Gates*, 462 U.S. at 238–39 (quotations and citations omitted). Search warrant affidavits should not be interpreted "in a hypertechnical, rather than a common-sense manner." *Id*. at 236 (quotations and citations omitted). A judge's determination of probable cause "should be paid great deference" by the reviewing court. *Id*. (quotations and citations omitted). "[T]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded warrants." *Id*. at 237 n.10 (quotations and citations omitted).

The defendant argues that Detective Szelewski's affidavit "failed to demonstrate probable cause to believe that the broad class of electronic devices it sought to seize [and search] would provide evidence related to the marijuana grow operations uncovered in the Golden Mirror and Fallen Shadow houses." (Doc. 34 at 7.) Specifically, the "affidavit failed to assert that any suspects in the marijuana grow operation even had – let alone used for any criminal purpose – any electronic devices." (*Id*. at 7–8.)

The government argues that the search warrant affidavit for the Butterfly Mountain residence and addendum articulated probable cause that evidence of the illegal marijuana grow operation was likely to be found in the residence, in the defendant's vehicle, and on his person. (Doc. 46 at 7–9.) The government further argues that there was probable cause to seize and search electronic devices because the affiant represented that, based on his experience, people who engage in marijuana grow operations store records on computers and cell phones. (*Id*. at 8–9.)

The Court concludes that there clearly was probable cause for the search warrant for Butterfly Mountain house and the defendant's person, and the addendum for the defendant's vehicle. Law enforcement had already discovered two marijuana grow operations in houses owned by the defendant. The defendant essentially admitted that he knew about the grow operation in the Golden Mirror house when he told law enforcement that his daughter and her husband would get in trouble if he provided information about what was going on in that house. The defendant's daughter not only implicated herself

(and her brother) in the marijuana grow operation, she told officers it was the defendant's idea to grow marijuana and he recently became upset when she did not want to help with the operation.  Finally, DES records showed that the defendant had no reportable income but owned an LLC whose address was the Butterfly Mountain house.  These facts establish a fair probability that evidence of the grow operation and money laundering may be found in the Butterfly Mountain residence and on the defendant's person.

With respect to the addendum authorizing the search of the defendant's vehicle, the affidavit noted that the defendant was seen leaving the Butterfly Mountain residence in that vehicle shortly before the execution of the search warrant and that officers were continuing to investigate drug dealing and money laundering.  Based on those facts and the facts detailed in the original affidavit for the Butterfly Mountain search warrant, there was also a fair probability that evidence of the grow operation and money laundering may be found in the vehicle and/or on the defendant's person.

The only real issue is whether there was a fair probability that evidence of the grow operation would be found on electronic devices.  As discussed earlier, a judge presented with a search warrant is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense.  *Angulo-Lopez*, 791 F.2d at 1399.  As a result, the Marana Municipal Court Judge was entitled to draw a reasonable inference that there was a fair probability that records related to drug dealing and money laundering may be stored on computers and cell phones which have made hard copies of documents and filing cabinets obsolete.

The Municipal Court Judge did not have to draw an inference, however, because Detective Szelewski articulated in his affidavit that, based on his experience, "drug dealers and money launderers utilize these devices to keep track of their negotiations, they take photographs and videos of their products and proceeds, as well as utilize the internet and social media accounts to advertise and promote their illegal enterprise." (Def. Ex. 22 at 4.) The Ninth Circuit has made clear that an issuing judge is able to consider a search warrant affiant's opinion as an expert and use their knowledge in determining there is a substantial

- 14 -

probability that evidence may be found on a suspect's electronic devices. *United States v. Lacey*, 119 F.3d 742, 745–46 (9th Cir. 1997) (finding probable cause to believe entire computer system may contain evidence of criminal activity and rejecting the argument that the warrant was too general because it authorized the seizure of the entire computer system and over 100 discs). Thus, the Municipal Court Judge properly relied on Detective Szelewski's expert opinion that there was a substantial probability that records related to a large marijuana grow operation would be found on electronic devices seized from the various locations.

For the reasons discussed above, the Court concludes that the search warrant affidavits for the Butterfly Mountain search warrant and addendum articulated probable cause to search the Butterfly Mountain house, the defendant, and his vehicle for evidence of the marijuana grow operations, including the contents of electronic devices found in those locations.

## B. *The Good Faith Exception*

"When police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant." *Herring v. United States*, 555 U.S. 135, 142 (2009) (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)). The inquiry is "'whether a reasonably well-trained officer would have known that the search was illegal' in light of 'all the circumstances.'" *Herring*, 555 U.S. at 145 (quoting *Leon*, 468 U.S. at 922 n.23).

The Supreme Court in *Leon* identified the following "four situations that *per se* fail to satisfy the good faith exception": (1) "the affiant recklessly or knowingly placed false information in the affidavit that misled the issuing judge"; (2) "the judge wholly abandon[s] his [or her] judicial role"; (3) "the affidavit 'is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'"; and (4) the warrant is "so facially deficient" that executing officers cannot presume it to be valid. *United States v. Underwood*, 725 F.3d 1076, 1085 (9th Cir. 2013) (alterations in original) (quoting *Leon*, 468 U.S. at 922–23).

The government argues that even if the Court concludes that there was not probable cause for the Butterfly Mountain search warrant and addendum, "the evidence seized need not be suppressed as long as . . . the seizing officers acted in good faith." (Doc. 46 at 15.) The government does not address the four situations set forth in *Leon* that *per se* fail to satisfy the good faith exception.

The defendant does not argue that the Marana Municipal Court Judge clearly abandoned her judicial role when issuing the search warrant and addendum, that the search warrant itself is deficient, or that the affidavit is lacking any indicia of probable cause to render law enforcement's belief in its existence entirely unreasonable. The defendant only argues that the search warrant affiant misled the Marana Municipal Court judge by providing "conclusory and incomplete information." (Doc. 52 at 7.)

The defendant claims that the affiant misled the judge by "relying on Brooke Koistenen's statements implicating her dad, without providing context that she had already lied to law enforcement on more than one occasion." (*Id*.) The defendant, however, does not articulate the alleged lies that Brooke Koistenen told law enforcement officers and counsel did not elicit testimony from witnesses on that issue. Thus, the Court cannot assess whether the alleged lies raised such a significant concern about her credibility that the state court judge would not have issued the Butterfly Mountain search warrant notwithstanding the other facts that supported probable cause—*i.e.*, the defendant owned the houses where the grow operations were occurring, officers saw him go into the Golden Mirror house, and he admitted to officers he was aware of the grow operation at the Golden Mirror house.

The defendant also claims that because law enforcement found "no indicia of marijuana grows" at the defendant's other properties, the affiant "misled the judge by implying by omission that Jeffrey Koistenen had no reportable income, and that all of his rental properties were used for marijuana grow operation[s.]" (*Id*.) The fact that the defendant had reportable income and owned other properties that were not involved in marijuana grows does not mean that he was not involved in and/or profiting from the marijuana grows at his Golden Mirror and Fallen Shadows houses. In fact, the opposite

inference can be drawn based on the facts set forth in the search warrant affidavit.

The Court finds the search warrant affiant did not mislead the judge who issued the Butterfly Mountain search warrant. As a result, the Court recommends that the District Court conclude that the good faith exception applies even if there was not probable cause for the search warrant.

### C. *The Butterfly Mountain search warrant and addendum are not overbroad*

The defendant argues that the Butterfly Mountain search warrant was overbroad because it authorized the seizure of all electronic devices without any limitation.  (Doc. 34 at 10.)  The defendant provides the following examples of how officers could have limited the scope of the search warrant:  (1) "identify a specific criminal transaction"; (2) "describe a kind of offense"; (3) "cite the statute particular to only one criminal act"; (4) "provide the precise identity and nature of the items to be seized within a general category, such as communications between specified individuals"; and/or (5) "provide a timeframe to assist agents in limiting the seizure to relevant items."  (*Id.* at 10–11 (citations omitted).)  The defendant claims that the Butterfly Mountain search warrant was an unlawful general warrant because it permitted officers to look through all electronic devices without any limitation.  (*Id.* at 11.)

The government argues that the Butterfly Mountain search warrant was not overboard or a general warrant because the "two crimes which were the subject of the searches were clearly spelled out within the warrant."  (Doc. 46 at 9.)  As a result, officers "knew they were limited to seizing items which could contain evidence" of these crimes.  (*Id.*)  Similarly, the search of electronic devices was limited to evidence of drug dealing and money laundering.  (*Id.* at 10.)

"Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based."  *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 702 (9th Cir. 2009) (quotations and citations omitted).  In *United States v. Adjani*, the Ninth Circuit held that a search warrant which authorized the seizure all electronic devices in the defendant's home, including a computer belonging to another

person who lived with the defendant but was not a suspect or named in the search warrant, was not overbroad.  452 F.3d 1140 (9th Cir. 2006).  The court reasoned that the "critical element in a reasonable search is not that the owner of the property is suspected of a crime but that there is a reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought."  *Id*. at 1146.  The Ninth Circuit has also held that the search of multiple computers and digital devices found at a residence was lawful based on one contraband image.  *See United States v. Brobst*, 558 F.3d 982, 993–94 (9th Cir. 2009) (search warrant authorizing the seizure and search of computers, compact discs, hard drives, memory cards, and other digital devices was lawful even though based on a witness's observation of one illicit photograph in the defendant's home); *United States v. Krupa*, 658 F.3d 1174, 1178 (9th Cir. 2011) (search of fifteen computers at a residence based on one contraband image and a report of child neglect was lawful.)

The defendant's overbreadth argument is undercut by the fact that the crimes at issue were not a discrete transaction or an isolated incident.  This sophisticated marijuana grow operation was ongoing and clearly taking place for some time.  Moreover, there were multiple people involved in this family-run operation.  Based on their experience, officers knew that electronic devices are used to further drug dealing and money laundering.  Officers had no way of knowing, however, what specific devices were being used, how many were being used, or who was using them.  As a result, the search warrant and addendum were not overbroad in authorizing officers to seize all electronic devices found at the search locations and search the devices for evidence of these articulated crimes.

Defendant's argument that the Butterfly Mountain search warrant should have contained a specific timeframe is weakened by the warrant's limited subject matter.  The Sixth Circuit Court of Appeals found portions of a warrant "sufficiently particular" without a time limitation because "their subject-matter limitation (fruits and evidence of gambling) fulfills the same function as a time limitation would have done, by limiting the warrant to evidence of the crimes described in the affidavit."  *United States v. Ford*, 184 F.3d 566,

578 (6th Cir. 1999). The Fourth Circuit Court of Appeals has also rejected the idea that the Fourth Amendment requires a warrant to contain a specific timeframe. *United States v. Cobb*, 970 F.3d 319, 328 (4th Cir. 2020). The *Cobb* court observed that "a warrant may satisfy the particularity requirement *either* by identifying the items to be seized by reference to a suspected criminal offense *or* by describing them in a manner that allows an executing officer to know precisely what he has been authorized to search and seize[,] [but] . . . [it] need not satisfy *both* criteria." *Id*. at 329 (quotations and citations omitted).

Here, officers did not know when the illegal marijuana grow began. Moreover, marijuana cultivation and money laundering are ongoing offenses that could have dated back years, which is evidenced by officers finding marijuana plants in various stages of cultivation, a sophisticated multi-room marijuana grow operation, equipment used to conduct the grow operation, evidence of processing of marijuana, and financial receipts and documents related to the grow operation. Thus, officers limited the warrant to a search of electronic devices for evidence of drug dealing and money laundering. Because this discreet subject matter is sufficiently limiting, a specific timeframe was not required. *See Ford*, 184 F.3d at 578.

### D. *The items to be seized were described with sufficient particularity*

The defendant argues that the Butterfly Mountain search warrant "failed to describe with sufficient particularity the objects of the search" because "the warrant called for the seizure, without limit," of all electronic devices. (Doc. 34 at 9.) The defendant also argues that: (1) the search warrant "gave officers no guidance as to what devices or data were reasonable to seize, nor what they should have done with the devices"; (2) "[n]o target or goal of the search was described"; (3) "[n]o relevant timeframe was described"; and (4) "[n]o suspects or types of suspects were identified." (*Id.* at 9–10.) Once again, the defendant argues that the search warrant was an unlawful general warrant because it allowed officers to "indiscriminately rummage[e] through the personal effects of the Koistenen household" as well as his electronic devices. (*Id.* at 10.)

The government argues that the search warrant described the items to be seized with

sufficient particularity because the law does not require (nor is it realistic) that law enforcement officers "know in advance which exact devices would contain relevant evidence." (Doc. 46 at 10.)  The officers did not know how many and what types of specific electronic devices may be found at the various locations; and officers cannot not determine whether electronic devices have evidence of a crime until information is extracted from them.  (*Id*.)  That is the purpose of a search warrant for electronic devices, and all the law requires is probable cause to believe that evidence of a crime may be contained on an electronic device.  (*Id*. at 10–11.)

"Particularity is the requirement that a warrant must clearly state what is being sought."  *United States v. Towne*, 997 F.2d 537, 544 (9th Cir. 1993). The particularity requirement prevents against the "exploratory rummaging in a person's belongings." *Andreson v. Maryland*, 427 U.S. 463, 480 (1976).  The requirement that a search warrant particularly describe "the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another." *Marron v. United States*, 275 U.S. 192, 196 (1927).  "As to what is to be taken, nothing is left to the discretion of the officer executing the warrant."  *Id*.

In *United States v. Schesso*, the Ninth Circuit rejected the argument that the search warrant lacked particularly reasoning that "[t]he government had no way of knowing which or how many illicit files there might be or where they might be stored, or of describing the items to be seized in a more precise manner."  730 F.3d 1040, 1046 (9th Cir. 2013).  Here, as in *Schesso*, officers had no way of knowing where records or images related to drug dealing and money laundering may be stored on the devices.  As a result, officers could not describe items that may be stored in electronic devices more precisely than evidence related to drug dealing and money laundering.  Thus, the list of items to be searched for on the electronic devices was sufficiently particular by limiting the search to evidence of these crimes.

. . .

. . .

- 20 -

### E. *The evidence established that the blue iPhone was found in the defendant's vehicle or a container within the vehicle*

The defendant argues that the government's inability to prove the location of the phone when seized renders the seizure unlawful. Stated another way, the government cannot prove that the phone was seized from one of the three locations authorized by the Butterfly search warrant and addendum—*i.e.*, the house, the vehicle, or the defendant's person.

The government argues that this failure "does not provide a basis for suppression and instead at best raises a factual dispute which goes to the weight rather than the admissibility of the evidence and which should be resolved by the jury." (Doc. 45 at 1.) The government also argues the location where the phone was found is irrelevant because the Butterfly Mountain search warrant and the addendum authorized the search of every possible location where the phone could have been found. In fact, the government contends that the testimony and body camera footage establish that the phone was found either in the defendant's car or a container in his car, *i.e.*, his wife's purse, which were both subject to search pursuant to the addendum to the Butterfly Mountain search warrant.

The testimony of the law enforcement officers regarding the blue iPhone clearly established that no one knows which officer found the phone, where it was found, or when it was found. That said, the Court agrees with the government that the testimony and evidence established that the phone could only have been found at one of the three locations covered by the Butterfly Mountain search warrant and addendum. Additionally, for the following reasons, the Court also agrees with the government that the testimony and evidence established that the phone had to have been found in the defendant's car or in his wife's purse, which was also subject to search. *See Wyoming v. Houghton*, 526 U.S. 295, 307 (1999) (probable cause to search a vehicle includes the right to search a passenger's belongings located within the vehicle if those belongings can conceal the object of the search).[14]

---

[14] Based on the Court's review of body camera footage, it is unlikely that the phone was

The testimony and the evidence collection log make clear that the phone was not found in the Butterfly Mountain house.  Moreover, the body camera footage makes clear that the phone was not found on the defendant's person.  The footage shows Officer Duarte searching the defendant, removing a wallet and loose cash from his pockets, and placing those items in an evidence bag.  Moreover, a few minutes after the search, the defendant confirmed with Officer Duarte that those were the only items in his pockets.  The defendant also confirmed that the phone was not seized from his residence or from his person because when asked where his phone was located, he said that it was either in the car or his wife had it.  Based on the defendant's statement, as well as the process of elimination based on the other evidence discussed above, the phone had to have been found in the defendant's car or his wife's purse, which was in the vehicle and therefore subject to search.  *See Houghton*, 526 U.S. at 307. (1999).

**F.  <u>Although the government has not met its burden in establishing that the defendant's vehicle was lawfully searched pursuant the addendum to the Butterfly Mountain search warrant, the search and seizure were lawful based on exceptions to the warrant requirement</u>**

The defendant also argues that the government's inability to establish that the search warrant addendum was issued prior to the search of the vehicle and seizure of the phone renders the search and seizure unlawful.[15]  The government argues that even if the phone

found in the purse.  When asked about the defendant's phone, his wife looked around the interior of the vehicle and said: "I don't know." (Def. Ex. 11 at 11:20.)  Moreover, Officer Hengsteler told her that he was not going to search her purse.  (Def. Ex. 11 at 10:40; Hr'g Tr. 2/23/2026 at 103.)  The body camera footage shows Officer Hengsteler putting the purse on the front windshield/hood area of the defendant's car and then later picking it from that location and handing it to the wife through the front passenger window. (Def. Ex. 11 at 29:00.)  Finally, Officer Hengsteler told other officers that an addendum to the warrant would be needed to conduct any search.

[15] In defendant's Supplemental Brief, he argues that "[e]ven if the blue iPhone had been seized within one of the exceptions to the warrant requirement, a warrant authorizing its search is a prerequisite to searching the phone." (Doc. 111 at 6.)  That argument is baffling (or at least confusing) because the Butterfly Mountain search warrant and addendum, which authorized the search of the blue iPhone and the other seized electronic devices for evidence of drug dealing and money laundering, had issued about a week before Detective Robles first searched the blue iPhone for that evidence and found suspected child pornography.  As discussed earlier, Detective Robles properly obtained a warrant to search the electronic devices evidence of child pornography, and the defendant does not challenge that warrant.

was seized prior to the issuance of the search warrant addendum, both the automobile exception to the warrant requirement and the inevitable discovery doctrine apply.[16]

As discussed earlier, the traffic stop of the defendant's vehicle occurred at about 6:20 p.m. and the Butterfly Mountain search warrant addendum for the defendant's vehicle was issued about an hour-and-a-half later at 7:56 p.m. Officer Hengsteler remained at the scene of the traffic stop until Sergeant Dittiger drove the defendant's vehicle back to the Butterfly Moutain house. Neither witness testified about what time they left the scene. Sergeant Dittiger could not have left the scene before 7:53 p.m. because Officer Duarte's body camera footage ends at that time and the defendant's vehicle is still at the scene of the traffic stop. (Def. Ex. 12 at 1:22:44.)

Because the body camera footage shows the defendant's vehicle at the scene of the traffic stop up until the time the search warrant addendum was issued, it is possible that the vehicle was lawfully searched at the scene pursuant to the addendum. There is no conclusive evidence about when the search occurred—*i.e.*, before or after the addendum was issued at 7:56 p.m.—because the witnesses shed no light on that issue. None of the witnesses took part in searching the vehicle and they do not recall any officer finding a phone in the defendant's vehicle at the scene of the traffic stop. In fact, the witnesses do not even know if the vehicle was searched at that time. Because there is no evidence about when the vehicle was searched, the Court finds that the government has not met its burden in establishing that the vehicle was lawfully searched and the phone was lawfully seized pursuant to the search warrant addendum. As a result, the Court turns to the exceptions to

---

[16] The government also argues that the defendant lacks standing to challenge the search of his wife's purse because defendant has not met his burden to demonstrate that he "had any expectation of privacy in his wife's purse." (Doc. 112 at 7.) The government's standing argument presumes that the phone was found in the wife's purse. There is no evidence, however, that the wife's purse was searched, let alone that the phone was found in the purse. As noted earlier, none of the officers know whether any search of the vehicle or containers in the vehicle was done at the scene of the traffic stop. Moreover, Officer Hengsteler told the wife that he was not going to search her purse. Although he cannot recall if he searched the purse, the body camera footage seems to reflect that he kept his promise. As a result, the Court need not further address the government's argument that the defendant does not have standing to challenge a search of the purse.

the warrant requirement.

### 1. *The Automobile Exception to the Warrant Requirement*

The Supreme Court has held that a warrantless search of an automobile and containers or packages found inside the vehicle is not unconstitutional if "officers have probable cause to believe that the vehicle contains contraband" and the vehicle is readily mobile. *United States v. Ross*, 456 U.S. 798, 808 (1982); *see also Maryland v. Dyson*, 527 U.S. 465, 466 (1999) (recognizing "automobile exception" to warrant requirement); *United States v. Faagai,* 869 F.3d 1145, 1150 (9th Cir. 2017) (citations omitted) (a warrantless search of a vehicle is lawful "if there is probable cause to believe the vehicle contains evidence of a crime"). Probable cause to search a vehicle also includes the right to search a passenger's belongings located within the vehicle if those belongings can conceal the object of the search. *Houghton*, 526 U.S. at 307. In fact, if probable cause exists to believe that a vehicle contains contraband and the vehicle is readily mobile, the scope of the warrantless search can be as broad as a magistrate could authorize through a warrant. *California v. Carney*, 471 U.S. 386, 394–95 (1985). There is no separate exigency requirement. *Dyson*, 527 U.S. at 466; *see also Ross,* 456 U.S. at 809.

The Court has already concluded that the affidavit submitted in support of the addendum to the Butterfly Mountain search warrant articulated probable cause to search the defendant's vehicle for evidence of drug dealing and money laundering and seize that evidence, including electronic devices. Additionally, there is no doubt that the defendant's vehicle was readily mobile. As the government points out, the stop occurred "on a public roadway and could have been moved beyond the reach of law enforcement at any moment absent intervention." (Doc. 112 at 3–4.) Moreover, the defendant's wife remained in the vehicle. For these reasons, the Court concludes that the government has met its burden in proving that the automobile exception applies, and as a result, the warrantless search of the vehicle and seizure of the defendant's phone was lawful.

### 2. *The Inevitable Discovery Doctrine*

The government also argues even if the blue iPhone was seized prior to the issuance

of the search warrant addendum and falls outside the automobile exception, "suppression is unwarranted because the phone would have been inevitably discovered through lawful means." (Doc. 112 at 4.)  For the following reasons, the Court agrees.

The inevitable discovery doctrine is an exception to the exclusionary rule.  *United States v. Andrade*, 784 F.2d 1431, 1433 (9th Cir. 1986) (citing *Nix v. Williams*, 467 U.S. 431 (1984)).  "The doctrine permits the government to rely on evidence that ultimately would have been discovered absent a constitutional violation."  *United States v. Ruckes*, 586 F.3d 713, 718 (9th Cir. 2009) (citing *Nix*, 467 U.S. at 443).  The doctrine "applies only when the fact that makes discovery inevitable is born of circumstances other than those brought to light by the illegal search itself."  *United States v. Reilly*, 224 F.3d 986, 995 (9th Cir. 2000) (citations omitted).   The burden is on the government to establish inevitable discovery by a preponderance of the evidence; and that evidence must be based on "historical facts capable of ready verification or impeachment[.]"  *Nix*, 467 U.S. at 44 n.5.

Here, the evidence established the requisite historical facts necessary for the Court to apply the inevitable discovery doctrine.  The Court agrees with the government that officers had already identified the defendant's vehicle as a target and relied on the same probable cause supporting the search warrant for the Butterfly Mountain house.  (Hr'g Tr. 3/5/2026 at 8.)  When officers stopped the vehicle, they were actively pursuing judicial authorization for an amendment to the warrant.  (Def. Ex. 23; Gov. Ex. 1.)  The decision to seek the warrant addendum stemmed from the broader investigation and existing probable cause, not the discovery of the phone.  (Gov. Ex. 1 at 2–3.)  Thus, the discovery of the phone was not "born of circumstances other than those brought to light by the [alleged] illegal search itself."  *Reilly*, 224 F.3d at 995.

Additionally, there is no evidence that the phone would have been rendered unavailable prior to the execution of the addendum.  The Court also agrees with the government that the evidence established that the defendant's vehicle "was under continuous police control from the time of the stop until the warrant addendum was obtained." (Doc. 112 at 6.)  Moreover, Sergeant Dittiger, a supervisor in the asset forfeiture

department of the Counter Narcotics Alliance, testified that he drove the defendant's vehicle from the scene of the traffic stop to the Butterfly Mountain house; and the vehicle (and many others) were seized by law enforcement.  Thus, the phone would have inevitably been discovered in the vehicle while in law enforcement custody and subject to search pursuant to the search warrant addendum.[17]

## IV.     RECOMMENDATION

For the foregoing reasons, the Magistrate Judge RECOMMENDS that the District Judge DENY the Defendant's Motions to Suppress  (Docs. 33 and 34).

Pursuant to 28 U.S.C. §636(b) and Rule 59(b)(2) of the Federal Rules of Criminal Procedure, any party may serve and file written objections within fourteen (14) days after being served with a copy of this Report and Recommendation.  No reply shall be filed unless leave is granted from the District Court.  If objections are filed, the parties should use the following case number: **CR-23-01495-TUC-AMM.**

Failure to file timely objections to any factual or legal determination of the Magistrate Judge in accordance with Fed. R. Crim. P. 59 may result in waiver of the right of review.

Dated this 8th day of April, 2026.

Eric J. Markovich
United States Magistrate Judge

---

[17] As the government acknowledges, its inability to establish which officer found the phone may be an issue at trial; but who found the phone is not relevant to the instant motion.